[No. S055130. Nov. 15, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
EDWARD PATRICK MORGAN, Defendant and Appellant.

## COUNSEL

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Therene Powell and C. Delaine Renard, Deputy State Public Defenders, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Jeffrey J. Koch and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**CHIN, J.**—Defendant Edward Patrick Morgan appeals from a judgment of the Orange County Superior Court imposing the death penalty following his convictions for first degree murder (Pen. Code, § 187),[1] kidnapping (§ 207, subd. (a)), and unlawful penetration with a foreign object (§ 289). The jury also found true special circumstance allegations that defendant committed the murder while engaged in the commission or attempted commission of (1) a kidnapping (§ 190.2, former subd. (a)(17)(ii)), and (2) unlawful penetration with a foreign object (*id.*, former subd. (a)(17)(xi)). This appeal is automatic. (§ 1239, subd. (b).)

### I. FACTS

In the early morning hours of Friday, May 20, 1994,[2] defendant pulled and then dragged 23-year-old Leanora Wong to the far end of an enclosed area in the parking lot of Bergen Brunswig Corporation, a company located

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] All calendar references to dates are to the year 1994 unless otherwise indicated.

behind the Australian Beach Club (the Club) in the city of Orange. The two had met for the first time in the Club that night. Once defendant and Wong were inside the enclosure, defendant twice inserted a sharp serrated object into Wong's genital area, choked or strangled her, hit her head against concrete, and beat her repeatedly. Wong went into traumatic shock and died due to a combination of all of her injuries and the loss of blood.

Hours earlier, at approximately 10:30 p.m. on May 19, defendant and his friend Robert Bogard were at the Club when defendant grabbed a waitress by her upper arm. Defendant pulled her towards him and squeezed her arm "really hard" as he told his friends she was "the most beautiful girl" and that he was going to take her "to Vegas tonight and marry her." She pushed defendant away because he was hurting her and reported the incident to the Club bouncers.

About the same time, Wong and her friend Rebecca Klein arrived at the Club in Wong's car. About 11:45 p.m., Wong and Klein were walking through the Club when defendant grabbed Wong's arm and pulled her to him. Klein heard Wong and defendant talking and exchanging their names and ages. The waitress who had been grabbed earlier by defendant noticed him showing pictures in a wallet to a young Asian woman who met Wong's description. Defendant repeatedly leaned over to Klein and said, "I really like your friend."

At approximately 1:15 a.m., Wong called out Klein's name. Klein looked up and saw defendant and Wong exiting the Club. Defendant "had a hold of both of her arms," but it appeared to Klein that Wong was leaving voluntarily. Immediately thereafter, Klein said goodbye to other friends and went outside. She expected to find Wong there because they had agreed neither would leave the Club without the other. Alarmed that Wong was not standing outside the Club's door, Klein searched for her "everywhere," including in cars parked nearby. She sought the help of her friends and the Club's security guard. Unable to locate Wong and concerned for Wong's safety, Klein left a note on Wong's car telling her to call when she got home. Klein then went home and called the police.

At the time, defendant was living at Bogard's residence, sleeping in the living room. Bogard had driven defendant to the Club that evening. Sometime after 1:30 a.m., Bogard left the Club after unsuccessfully searching for defendant to give him a ride home.

Bergen Brunswig's security cameras captured images of Wong and defendant from 1:23 a.m. to 1:41 a.m. on the morning of the murder. When first seen, the two appear to be walking side by side as they entered the north gate

entrance to the company's parking lot (the lot). A still frame from the security camera videotape showed defendant and Wong six seconds later. The two had moved approximately four or five feet farther into the lot. Their relative positions had changed. Defendant was continuing to walk south, away from the Club, but Wong now was behind him. Her lower body appeared to be trying to pull away from defendant. Her right arm was extended forward and appears to be on defendant's bent right arm. Defendant's left arm is not visible, but defendant concedes the photograph "suggests [he] is holding onto some part of Ms. Wong's body." Ten minutes later, the videotape showed defendant and Wong[3] approaching a short flight of stairs that led from the lot up into a concrete enclosure. One minute later, a camera showed defendant leaning over Wong at the foot of those stairs. Two minutes later, it showed defendant standing above Wong, walking backwards, and dragging her with him. The camera caught defendant leaning against an air conditioning unit in the enclosure, leaving and returning to the enclosure three times, and finally walking away from the area near where Wong's body was located.

Wong's body was discovered at approximately 3:30 a.m. on May 20. Three six-foot high concrete walls surrounded the enclosure in which Wong was found. The stairs leading to the enclosure were at its northwest corner. Wong's body was in the southeast corner, behind the air conditioning unit that filled the center of the enclosure. The distance between the point inside the north gate where defendant can be seen on a photograph taken from the security videotape in front of Wong and possibly pulling her in the direction of the stairs leading to the enclosure and the foot of the stairs was 208 feet. The distance from the foot of the stairs to Wong's body was 37 feet.

Wong had been "beaten very badly" about her face. Her bra was pushed up, her breasts were exposed, and her jeans and underpants were pulled down to just above her knees so that "her vaginal area was exposed." Her underpants were soaked with blood. Pools of blood underneath her buttocks, as well as blood smears and streaks on and near her body, revealed that Wong had been turned from her stomach onto her back at some point and that her bloody hair had dragged across the south wall. Boot prints on Wong's body and in the blood on the concrete floor in the enclosure had a pattern consistent with the boots that defendant was wearing at the Club. One of the boot print bruises was above Wong's right breast.

Scuff marks consistent with the heels of Wong's shoes were found along the concrete walkway at the north side of the enclosure, and one of Wong's shoes was off when she was discovered. An earring, a pendant, and dark hair

---

[3] Although some of the photographs show shadows or unidentifiable individuals near or inside the enclosure, we refer to the individuals as defendant and Wong because defendant concedes he killed Wong inside the enclosure.

were found between the steps and Wong's body, and defendant's bloody palm print was on a radiator bar coming from the air conditioning unit.

Wong's autopsy revealed severe injuries to the head and neck caused by a blunt instrument such as a fist or boot. Her nose was pushed to one side, and her chin had a gaping laceration. Bleeding in her neck muscles and hemorrhages in her eyes revealed that Wong had been strangled or choked and had experienced asphyxiation for a period of time. Injuries to a nipple and a wrist were consistent with bite marks. Wong's right arm and elbow, as well as her buttocks, had injuries consistent with her having been dragged across a concrete surface while alive. Five of Wong's ribs were fractured, and she had shoulder injuries consistent with someone stomping on her. Fractures on the front and back of Wong's skull could have been caused by a strong person repeatedly shoving her head against a wall or onto concrete.[4] Those two traumas caused bleeding inside the skull and swelling of the brain. At some point while Wong was alive, her tongue hemorrhaged when it "got caught, most likely between [her] teeth."

The autopsy additionally revealed massive bleeding in the area of Wong's vagina and anus. The opening of the vagina was cut, and a rigid object that was sharp and serrated had twice been thrust approximately four inches into the deep soft tissue of Wong's perineal area between her vaginal and anal openings. Foreign material consistent with concrete was found inside the entire tract of this injury. The pathologist believed a knife or cylindrical steel rebar pipe had cut Wong's vaginal opening and been thrust into the perineum. Wong's anal opening also was cut, and the anus was dilated. The dilation could have been caused by the insertion of a penis, but the laceration was caused by a sharp object similar to the one inserted into the vaginal opening. Wong's cervix was bruised. The "degree of trauma and associated bleeding" caused by the genital injuries established that Wong was alive when they were inflicted.

Bogard awoke between 7:00 and 8:00 a.m. on May 20 to find defendant asleep on the floor. Defendant told Bogard he had "walked home"; later that day, defendant told Bogard that he had paid people he met at a gas station to take him home. When the two met after work that afternoon, Bogard noticed that defendant had changed his appearance by shaving off his long sideburns.

At 8:30 a.m. on Friday, May 20, defendant called Donna Tatum, a woman he was dating at the time. He convinced her to pick him up at 9:00 p.m. She

---

[4] Klein described defendant as a large man with "shaved arms" and the look of a "body builder." She estimated that he was approximately five feet nine inches tall, that he weighed almost 200 pounds, and that he was about 28 years old. Wong was approximately five feet two inches tall and weighed approximately 110 pounds. Defendant's friend Bogard estimated that defendant was about 30 years old at the time of the 1996 trial.

drove him to her home in Ontario. That night, Tatum noticed scratches on defendant's hands and arms.

That same evening, Bogard saw a television newscast about the murder of a woman near the Club. Based upon the description given, he suspected defendant might have been involved. He met with police and provided information about defendant and Sonya Marvin, defendant's girlfriend, who lived in Plumas County.

Defendant spent the day and night of May 21 at Tatum's house, calling many people, including Bogard and Marvin. Once when he called Bogard, a police officer answered and asked defendant to turn himself in. Defendant said he would do so within the hour, but he did not leave Tatum's house. After watching a report that described Wong's murder and displayed the suspect's picture, Tatum realized defendant was the killer. She did not turn defendant in to the police; fearing defendant, she instead agreed to lie and provide an alibi by saying she had picked him up at the Club on the evening of May 19. On May 22, Tatum drove defendant to a rest stop in Avenal. Defendant then got into Marvin's car and left.[5]

On May 23, Plumas County deputy sheriffs watched defendant leave Marvin's house, lower his cap to his eyes, look around, and begin to walk down the street. Defendant turned and ran off when he noticed a patrol car. A sergeant cornered defendant in a United States Forest Service compound, pointed his gun at him, and ordered him to stop. Instead, defendant dove under a nearby water tanker. With his gun pointed at defendant, the sergeant ordered him to come out and stay on the ground. Defendant crawled out, stood, and walked toward the officer, saying, "I didn't do it, go ahead and shoot me." The sergeant discharged pepper spray into defendant's face to avoid having to shoot him.

Sergeant Rives interviewed defendant at the jail after defendant was admonished under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]. Defendant said he met a girl at a club on May 19, they spoke for about 10 minutes, and they then went outside because they were concerned their friends would leave without them. Defendant said he was picked up by his friend Donna and that, when he left, the girl was okay and was walking to her car to check on it. Near the end of the interview, defendant asked, "Why didn't they shoot me?" When the sergeant asked why, defendant said, "Cause I wouldn't have to go through all this."

---

[5] At the time of defendant's trial, Tatum faced criminal charges based on having been an accessory. She waived her privilege against self-incrimination and testified without having been promised any special treatment in return for her testimony.

A detective flew to Plumas County and brought defendant back to Orange County. Examining defendant for injuries consistent with a struggle, the detective noted that defendant had quarter-inch healing wounds on his upper left shoulder, both arms, his right thumb, and the insides of his hands.

Defendant did not testify at the guilt phase of his trial. However, counsel conceded during closing argument that defendant killed Wong.

At the penalty phase, the prosecution introduced evidence of defendant's prior sexual offenses in 1983, 1984, and 1990, as well as evidence of the felony convictions that were based upon defendant's prior sexual misconduct.

In the first incident, defendant broke into the home of his former girlfriend. He kicked in a locked door, grabbed her, carried her outside, and struck her head on concrete as he threw her to the ground. He then tore off her panties and put his fingers in her vagina. Based upon this incident, defendant pleaded guilty to unlawful sexual intercourse with a minor, a felony. (§ 261.5.)

In the second incident, defendant struck up a conversation with a 16 year old at a party. After he convinced her to leave with him, he forced her onto the ground, showed her a knife, and threatened to kill her if she screamed. As he raped her, he repeatedly hit her and banged her head against the ground. He ran off when she pretended she was passed out or dead. Based upon this incident, defendant pleaded guilty to forcible rape, a felony. (§ 261, subd. (a)(2).)

In the third incident, defendant stopped his car to ask a 16-year-old girl for directions. She accepted his invitation to drive her home. He bought beer, and she agreed to play a drinking game with him near some vacant buildings. He lured her to a deserted area where he touched her breasts. She tried to stop him, but he rolled on top of her and raped her. Based upon this incident, defendant pleaded guilty to unlawful sexual intercourse with a minor, a felony. (§ 261.5.)

The prosecution also introduced victim impact evidence through Wong's parents and younger brother. It was stipulated that defendant was paroled to Orange County less than two months before Wong's murder.

Defendant called his friends and teachers to testify regarding defendant's uncontrollable volatile temper when drinking, his ease in developing casual sexual relationships, his behavioral and emotional difficulties, and his conflicts with his mother.

School records introduced into evidence revealed that defendant was admitted to a psychiatric hospital at the age of 10 because of academic and

behavioral difficulties. He was discharged five months later and placed in a program for children who were severely emotionally disturbed. Psychological testing done at that time found defendant to be an "angry, conflicted, and depressed child in response to the conflict and unmet dependency needs within his family." Psychological reports and evaluations noted a history of conflict between defendant's parents as well as between defendant and his mother, and they suggested that defendant acted out at home in an apparent attempt to obtain nurturance. After more than two years of intensive therapy in the program, defendant began to accept some responsibility for his behavior. However, he remained a chronically depressed, emotionally needy child who defended against his problems with a hostile stance. Once the family moved to California, defendant attended special education classes at public school. Further testing suggested he used hostile behavior to avoid interpersonal closeness, which he found threatening. The records also showed that defendant had a learning disability that caused him to have difficulty with abstract concepts, reasoning, and problem solving.

Defendant testified that he felt terrible about Wong's death and was sorry he had caused it. He expressed uncertainty regarding the appropriate punishment for his crimes, noting that it would be hard to live with the guilt his actions caused.

## II. GUILT PHASE ISSUES

### A. *Alleged Vagueness of Asportation Element of Simple Kidnapping*

Defendant contends the asportation element of simple kidnapping under section 207, requiring movement of a "substantial distance," was "impermissibly vague under the [statutory] construction that existed at the time of his 1994 offense and 1996 trial," in violation of our state and federal Constitutions. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.)[6] We disagree.

---

[6] With respect to this and most other claims on appeal, defendant argues that the asserted error or misconduct infringed constitutional rights. At trial, he failed to assert some or all of the constitutional arguments he now advances. "In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind (e.g., failure to instruct sua sponte; erroneous instruction affecting defendant's substantial rights) that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No

■ "Section 207, originally enacted in 1872, delineated what is today called 'simple kidnapping' and merely restated the common law, which required that the victim be moved across county or state lines. [Citations.]" (*People v. Nguyen* (2000) 22 Cal.4th 872, 882 [95 Cal.Rptr.2d 178, 997 P.2d 493].) Section 207, subdivision (a), now provides, and at the time of defendant's crimes provided, that "[e]very person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping." "The language 'into another part of the same county' was added in 1905 in response to *Ex parte Keil* (1890) 85 Cal. 309 [24 P. 742], in which this court held that the forcible removal of a person 20 miles from San Pedro to Santa Catalina Island, both in Los Angeles County, was not kidnapping within the meaning of the statute as it existed at that time. [Citations.]" (*People v. Rayford* (1994) 9 Cal.4th 1, 8, fn. 3 [36 Cal.Rptr.2d 317, 884 P.2d 1369] (*Rayford*).)

The trial court instructed defendant's jury that "[e]very person who unlawfully and with physical force or by any other means of instilling fear, steals or takes or holds . . . another person, and carries such person without her consent, compels any other person without her consent, and because of a reasonable apprehension of harm, to move *for a substantial distance, that is, a distance more than slight or trivial,* is guilty of the crime of kidnapping in violation of Penal Code section 207(a)." (CALJIC No. 9.50, italics added.)

■ "The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements: a criminal statute must ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." ' [Citations.]" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567 [20 Cal.Rptr.2d 341, 853 P.2d 507].)

■ This court has recognized "the strong presumption that legislative enactments 'must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language.' " (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852].) Therefore, "a party must do more than identify

separate constitutional discussion is required in such cases, and we therefore provide none." (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 [42 Cal.Rptr.3d 677, 133 P.3d 581].)

some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that 'the law is impermissibly vague *in all of its applications.*' . . . [Citation.]" (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1201 [246 Cal.Rptr. 629, 753 P.2d 585].) Stated differently, " '[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language.' [Citation.]" (*People v. Ervin* (1997) 53 Cal.App.4th 1323, 1329 [62 Cal.Rptr.2d 231].)

"The law is replete with instances in which a person must, at his peril, govern his conduct by such nonmathematical standards as 'reasonable,' 'prudent,' 'necessary and proper,' 'substantial,' and the like. Indeed, a wide spectrum of human activities is regulated by such terms: thus one man may be given a speeding ticket if he overestimates the 'reasonable or prudent' speed to drive his car in the circumstances (Veh. Code, § 22350), while another may be incarcerated in state prison on a conviction of wilful homicide if he misjudges the 'reasonable' amount of force he may use in repelling an assault [citation]. As the Supreme Court stated in *Go-Bart Importing Co.* v. *United States* (1931) 282 U.S. 344, 357 [75 L.Ed. 374, 51 S.Ct. 153], 'There is no formula for the determination of reasonableness.' Yet standards of this kind are not impermissively vague, provided their meaning can be objectively ascertained by reference to common experiences of mankind." (*People v. Daniels* (1969) 71 Cal.2d 1119, 1128–1129 [80 Cal.Rptr. 897, 459 P.2d 225].)

A sister state's opinion found "substantial distance" a constitutionally sufficient requirement when considering a similar asportation statutory requirement. In 1977, the Supreme Court of North Dakota considered a constitutional challenge to the use of the word "substantial" when modifying the noun "distance" in the context of that state's kidnapping statute. (*State v. Motsko* (N.D. 1977) 261 N.W.2d 860.) In concluding the word "substantial" in that context did not render the kidnapping statute unconstitutionally vague, the court concluded that "substantial" "acquires precision according to the, term it modifies as an adjective. . . . As used in [the kidnapping statute], it means 'significant,' [or] 'important,' . . . as distinguished from 'insignificant,' 'trivial,' [or] 'nominal . . .' . . . . Thus, if a complainant was moved a 'significant' or 'important'—as distinguished from 'trivial'—distance and her liberty was interfered with in a real, important, or significant way, the [North Dakota kidnapping] statute would be satisfied." (*Id.* at p. 865, citation omitted.)

We reach a similar conclusion. We are convinced that, in the context of our simple kidnapping statute, where the adjective "substantial" modifies the noun "distance," the word "substantial" means a "significant amount" as

contrasted with a distance that is "trivial," and that the phrase "substantial distance" meets the constitutional requirement of reasonable certainty.

Moreover, case law in effect at the time of defendant's offense provided adequate guidance as to what distances would be considered "substantial" under the simple kidnapping statute. (*People v. Caudillo* (1978) 21 Cal.3d 562, 573–574 [146 Cal.Rptr. 859, 580 P.2d 274] (*Caudillo*), overruled in *People v. Martinez* (1999) 20 Cal.4th 225, 235–238 & fn. 6 [83 Cal.Rptr.2d 533, 973 P.2d 512] (*Martinez*).) In *Caudillo,* we used an earlier case in which the victim was moved 200 feet as an example of sufficient distance to sustain a conviction for simple kidnapping. (*Caudillo, supra,* 21 Cal.3d at pp. 573–574, citing *People v. Stender* (1975) 47 Cal.App.3d 413, 423 [121 Cal.Rptr. 334] (*Stender*).) Our citation to *Stender* in *Caudillo* provided defendant with adequate and fair warning that moving his female victim against her will for a distance of more than 200 feet was prohibited. On the other hand, at the time of defendant's offense, we had stated that forcibly moving someone 90 feet did not amount to "a taking 'into another part of the same county' and hence would be insufficient as a matter of law" to support a conviction of simple kidnapping. (*People v. Green* (1980) 27 Cal.3d 1, 67 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*), overruled by *Martinez, supra,* 20 Cal.4th 225.)

In light of our statements in *Caudillo* and *Green,* defendant had fair notice of what was and what was not proscribed under our statute for simple kidnapping at the time of his offense. We therefore reject defendant's vagueness challenge to the term "substantial distance" as set forth in the definition of simple kidnapping at the time of his offenses. In turn, we conclude that the term "substantial" was not so vague in the context of the kidnapping law at the time of defendant's trial to violate due process or constitute cruel or unusual punishment.

### B. Submission of Kidnapping Charge on a Legally Inadequate Theory

Defendant contends the kidnapping charge was improperly submitted to the jury on a legally inadequate theory to support a conviction. He claims the evidence "established an asportation with three segments," one from the door of the Club to the entrance of the lot, one that began "six seconds later . . . a few feet inside the entrance to the parking lot, and continued for 245 feet to the southeast corner of the concrete enclosure where Ms. Wong's body was found," and one, "a subset of the second, began at the foot of the stairs leading to the concrete enclosure and ended 37 feet away in the southeast corner of the enclosure." He argues that "the instructions given to the jury allowed [him] to be found guilty based on . . . [the 37-foot] segment of the asportation that began . . . at the foot of the stairs leading to the entrance to

the concrete enclosure" and ended where Wong's body was found. Defendant also argues that the prosecutor's closing arguments at trial encouraged the jury to return a verdict of guilt on simple kidnapping based on a legally inadequate theory. For the reasons stated below, we conclude that, under the law in effect at the time defendant committed his offenses, the prosecutor did argue two separate theories of kidnapping, one of which was legally inadequate. In turn, because we cannot determine from the record on which theory the general verdict of guilt as to simple kidnapping rests, we agree with defendant that his kidnapping conviction must be reversed and that the kidnapping-murder special-circumstance finding must be set aside.

The prosecutor argued to the jury that what constituted a "substantial distance" "is a question of fact for you," and that "[n]o one is going to tell you a particular number of feet is a kidnapping. We don't say 20 feet is a kidnapping, 40 feet, three miles. It is a juror's determination as to whether or not that distance is slight or trivial, or whether or not it is substantial."

The prosecutor then suggested to the jurors that they could "look at certain things as far as this consideration. *You can look at the locations and the boundaries over which this occurred; the fact that he is taking her in a darkened parking lot; the fact that he is dragging her up some stairs; the fact that he has her by her hair and dragging her on the ground; that this is a substantial distance, it is not trivial.* Number two, *you can look at the distance in view of the context served.* The fact of the matter is *he is taking Leonora Wong from a public place, a place that is open to public view, to a place where she is going to be hidden. A place which substantially increases her danger.* See, the reason he took her there was so no one would see her. He could do whatever he wanted to her inside that enclosure without being seen, he thought. *So him moving her was more than a slight or trivial distance. It is not like he is taking her two feet around the back of a car or moving her just a couple of inches in a parking lot, he is moving her a substantial distance, which increased the risk of her harm.*"

The prosecutor then told the jury that "the difference between the kidnapping and felony false imprisonment is false imprisonment doesn't require somebody to be moved a substantial distance, which is more than trivial . . . . So . . . if you think he just moved her a trivial distance, you will find it is false imprisonment. *I submit this was a substantial distance that increased her risk of harm.*"

In his closing argument, defense counsel focused the jury's attention on "whether the circumstantial evidence shows there is a substantial movement." He told the jury that the prosecutor would say that "because it is 208 feet from . . . the entry to the parking lot to the enclosure, that that is a substantial

distance." Defense counsel then argued there is a reasonable doubt that the second photograph that captured an image of defendant and Wong at 208 feet from the foot of the steps depicts defendant forcibly moving Wong towards the enclosure in which she was sexually attacked and then killed. He argued that the unusual pose in the photograph in which Wong was "stopped" and "leaning forward" was ambiguous and could depict a moment when Wong's "heel slipped" or a "playful swing or anything else." Defense counsel then argued, if there was a reasonable doubt whether the photograph depicted the beginning of a kidnapping, the jury must conclude the forced movement began "some other place, if at all, on its way to the enclosure" and that "then and only then do you get to the questions of whether or not that is a substantial distance." Counsel next told the jury, "And for the life of me you can't get beyond the fact that any movement, any movement at all, is simply along the side of one building. . . . If you have a reasonable doubt that there is a substantial movement by force or fear more than simply . . . along the building into the enclosure, then the benefit of that doubt has to befall [*sic*] the accused." At the end of his argument to the jury, defense counsel reiterated, "The argument of the prosecution is that that [second] picture shows some unconsensual movement. My statement to you is that that is susceptible of many different interpretations."

On rebuttal, the prosecutor argued that defense counsel "seems to think that for some reason I have to prove that a kidnapping started . . . 245 feet away. There is no specific distance for kidnapping. *If you think it happened at 45 feet and at another 37 inside the enclosure, that if you believe it to be a substantial distance, more than slight or trivial, that is significant.* It would be ridiculous to have a law say that to have a kidnapping you have to be more than 125 feet. It is absurd. Each case should rise and fall on its own facts. *He is taking this woman to a place which substantially increases her risk of harm, and that is what we are talking about as far as the kidnapping.*" He later said, "It is easy for a defense attorney to stand up here and say that this was a trivial distance, kidnapping, it is not a substantial distance, [but] it is kidnapping 45 feet." After the trial court sustained an objection to the prosecutor's asking the jury to consider whether "that distance was trivial to Leonora Wong," the prosecutor continued, "I submit that that is not a trivial distance, *that is, a substantial distance that increased her risk of harm and likely [sic] to be killed.*" (Italics added.)

At the time of the offenses in this case, what evidence could be included in a determination of "substantial distance" was governed by our holding in *Caudillo*. In 1978, this court held in *Caudillo* that " 'the determining factor in the crime of [simple] kidnaping is the actual distance of the victim's movements . . . .' " (*Caudillo, supra,* 21 Cal.3d at p. 572.) We stated, "Neither the incidental nature of the movement, the defendant's motivation to escape detection, nor the possible enhancement of danger to the victim

resulting from the movement is a factor to be considered in the determination of substantiality of movement for the offense of [simple] kidnaping." (*Id.* at p. 574.) In *Caudillo,* the defendant forcibly moved his rape victim an "*unspecified* distance from the elevator to the storage room, and from the storage room to her apartment." (*Id.* at p. 572.) We concluded this was "not substantial movement" within the meaning of section 207. (*Caudillo, supra,* 21 Cal.3d at p. 572.) In 1980, while our holding in *Caudillo* was in effect, this court held that the 90 feet the victim was forcibly moved was "insufficient as a matter of law" to constitute substantial distance within the meaning of section 207, our simple kidnapping statute. (*Green, supra,* 27 Cal.3d at p. 67.)

In *Martinez,* we noted that, "[i]n cases involving simple kidnapping, the instructions currently provide that the victim must have been moved 'for a substantial distance, that is, a distance more than slight or trivial.' (See CALJIC No. 9.50.)" (*Martinez, supra,* 20 Cal.4th at p. 237.) We then overruled *Caudillo* and held that for simple kidnapping, with regard to *future* cases, it would "be proper for the court to instruct that, in determining whether the movement is ' "substantial in character" ' [citation], the jury should consider the totality of the circumstances. Thus, in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes." (*Martinez, supra,* 20 Cal.4th at p. 237.) We explicitly held that our decision in *Martinez* was not retroactive because it "constitute[d] 'judicial enlargement of a criminal Act' (*Pierce v. United States* (1941) 314 U.S. 306, 311 [86 L.Ed. 226, 62 S.Ct. 237]) for which defendant must have had fair warning to be held accountable." (*Martinez, supra,* 20 Cal.4th at p. 239.)

We added that our holding in *Martinez* could not be applied retroactively to the defendant in *Martinez* or to any other defendant whose offense occurred while *Caudillo* was the law because, "in overruling *Caudillo* we have not only expanded the factual basis for making that determination but in the process effectively overruled cases holding that specific distances failed to establish asportation." (*Martinez, supra,* 20 Cal.4th at p. 239.) We then explained, "Two of those decisions are particularly relevant as to these facts. In *People* v. *Brown* [(1974)] 11 Cal.3d 784 [114 Cal.Rptr. 426, 523 P.2d 226], the defendant confronted the victim in her kitchen and 'forcibly took her through [the] house in search of her husband.' (*Id.* at p. 788.) They returned to the kitchen and then the living room, after which the defendant dragged her outside for an additional 75 feet. (*Id.* at pp. 788–789.) Without considering any other factors, the court found the distance involved 'insufficient to

show that the movements were substantial.' (*Id.* at p. 789.) Again, in *People v. Green, supra,* 27 Cal.3d at page 67, a 90-foot movement was 'insufficient as a matter of law' '[f]or the reasons stated in *Brown* . . . .' " (*Martinez,* 20 Cal.4th at p. 239.)

Had defendant's criminal conduct against Wong occurred in 1999, after *Martinez* overruled *Caudillo,* the prosecutor's closing and rebuttal arguments in this case would have been entirely proper. However, the crimes in this case occurred in May 1994, and, accordingly, *Caudillo* and *Green* governed defendant's case.

Under those two holdings, the prosecutor's argument that the forced movement began when defendant "got hold" of Wong and "managed to manipulate her out of this bar" and that defense counsel could not be "serious" in arguing that the photograph taken 245 feet from where Wong was killed showed "forceful pulling, a playful swing, a stumble" set forth a legally adequate theory that defendant forcibly moved Wong for a distance of at least 245 feet. On the other hand, the prosecutor's argument that 45 feet or the 37 feet from the steps to the area in the enclosure where Wong was killed could constitute substantial distance by considering such factors as the boundaries crossed and the increased risk of harm to the victim presented a legally inadequate theory *at the time of defendant's offense.*

Here, as in *Green,* in which the prosecutor improperly argued that 90 feet, as well as five miles or 20 miles met the simple kidnapping "substantial distance" requirement for asportation, "[n]othing in the instructions . . . disabused the jury of [the] notion" that a distance less than 90 feet could constitute "substantial distance" under the law at the time in question. (*Green, supra,* 27 Cal.3d at p. 68.) The trial court simply instructed the jury that the crime is committed when the defendant moves a person by force or fear, against his will and without his consent, and that the asportation element of both the kidnapping charge and the kidnapping-murder special-circumstance allegation required movement by force or fear for a "substantial distance, that is, a distance more than slight or trivial." (CALJIC No. 9.50.) As discussed above, the trial court's jury instruction was proper, but, as in *Green,* "[n]o further guidance was provided on the latter issue, although it [was at the time in question] 'the determining factor in the crime of kidnaping' (*People v. Stanworth* (1974) . . . 11 Cal.3d [588,] 601 [114 Cal.Rptr. 250, 522 P.2d 1058]). Finally, as noted above the jury's verdict was general, merely finding defendant guilty of the . . . offense of kidnaping in violation in of section 207." (*Green, supra,* 27 Cal.3d at pp. 68–69.)

We note that, after defendant's crimes but before his trial, in *Rayford,* we had clarified that there was no minimum number of feet to satisfy the

asportation standard of *aggravated* kidnapping. Foreshadowing our overruling *Caudillo,* we noted in dicta that "[b]ecause we interpret section 208[, subdivision] (d) to incorporate the aggravated kidnapping asportation standard, we need not reach the question of whether *Caudillo*'s rejection of certain factors other than the actual distance traveled should be revisited. We recognize that *Caudillo*'s narrow approach might be subject to the criticism that it fails to appreciate that a primary reason forcible asportation is proscribed by the kidnapping statutes is the increase in the risk of harm to the victim that arises from the asportation." (*Rayford, supra,* 9 Cal.4th at p. 22.) This language in *Rayford* may have encouraged the prosecutor to argue that "substantial distance" for simple kidnapping could be based on factors other than actual distance traveled, such as increased risk of harm, and may have discouraged an objection by defense counsel to that argument. However, in light of our interrelated holdings in *Martinez* that (1) *Caudillo* was the law until we overruled it in *Martinez* and (2) *Martinez* was not retroactive, we conclude that the prosecutor presented defendant's case to the jury on alternate theories, one of which was legally correct and the other legally inadequate at the time of defendant's offenses.

We explained in *Green* that the record "contains evidence that could have led the jury to predicate its kidnaping verdict on the legally sufficient portion of [the victim's] asportation. But it also contains evidence that could have led the jury to rely instead on either of the legally insufficient portions of that movement. The instructions permitted the jury to take the latter course; and the district attorney expressly urged such a verdict in his argument, at least with respect to the final 90 feet that the victim was transported. We simply cannot tell from this record which theory the jury in fact adopted." (*Green, supra,* 27 Cal.3d at p. 71.) Accordingly, we set aside the kidnapping conviction and the related kidnapping-murder special circumstance. (*Id.* at p. 74.) In *People v. Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45] (*Guiton*), this court recognized that the *"Green* rule, as applied to the facts of that case, is readily construed as coming within the . . . category of a 'legally inadequate theory' generally requiring reversal. At issue was whether 90 feet was sufficient asportation to satisfy the elements, or the 'statutory definition,' of kidnapping. There was no insufficiency of proof in the sense that there clearly was evidence from which a jury could find that the victim had been asported the 90 feet. Instead, we held that the distance was '*legally* insufficient.' [Citation.]" (*Id.* at p. 1128.)

Defendant's case falls within the rule in *Green,* as construed in *Guiton.* At issue here was whether the 37 feet argued by the prosecutor was sufficient to satisfy the elements or statutory definition of kidnapping at the time of defendant's offenses. There was no insufficiency of proof in the sense that there was evidence from which a jury could find that Wong had been asported 37 feet. However, *Caudillo* and *Green* require us to hold that 45 feet or less

was legally insufficient at the time of defendant's offenses. The prosecutor's argument that 37 feet was adequate based upon factors other than distance, such as increased risk of harm, set forth a legally inadequate theory that requires reversal "absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton, supra*, 4 Cal.4th at p. 1129.)

█ Because here, as in *Green*, we are " 'unable to determine which of the prosecution's theories served as the basis for the jury's verdict' " (*Green, supra*, 27 Cal.3d at p. 70), we must reverse the conviction for simple kidnapping. For the same reasons, the kidnapping-murder special circumstance must be set aside. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 499 [117 Cal.Rptr.2d 45, 40 P.3d 754] (*Hillhouse*).) However, we need not reverse the first degree murder conviction. As we explain below, the evidence supported the unlawful-penetration special-circumstance finding. That finding shows the jury necessarily concluded the killing was committed in the course of an unlawful penetration with a foreign object. "Thus, we know that the first degree murder verdict rested on at least one correct theory. [Citations.]" (*Hillhouse, supra*, 27 Cal.4th at p. 499, and cases cited therein.)

## C. *Sufficiency of the Evidence of Asportation for Simple Kidnapping*

The jury was instructed that the forced movement for simple kidnapping had to be "for a substantial distance, that is, a distance more than slight or trivial." (CALJIC No. 9.50.) Defendant contends there was insufficient evidence to support the jury's determination that the forced movement in his case satisfied the "substantial distance" requirement under section 207, subdivision (a), as that this same requirement was defined at the time of his offenses. He directs this same challenge to the kidnapping conviction, the kidnapping-murder special circumstance, and the murder conviction insofar as it rests on a kidnapping-murder theory. Although we have concluded that the kidnapping conviction must be reversed because it was presented to the jury on both a legally adequate and a legally inadequate theory, we must nonetheless assess the sufficiency of the evidence to determine whether defendant may again be tried for the kidnapping offense. (*People v. Hayes* (1990) 52 Cal.3d 577 [276 Cal.Rptr. 874, 802 P.2d 376].)[7]

"In reviewing the sufficiency of the evidence, we must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41

---

[7] Because we reverse the kidnapping conviction and set aside the kidnapping-murder special-circumstance finding, with the exception of his insufficiency of the evidence claim, we need not consider defendant's other guilt phase issues that related to the kidnapping charge.

Cal.Rptr.2d 826, 896 P.2d 119].) "Substantial evidence" is evidence which is " 'reasonable in nature, credible, and of solid value.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738].)

In *Caudillo,* we held that the determining factor in the crime of simple kidnapping was the actual distance of the victim's movements. (*Caudillo, supra,* 21 Cal.3d at p. 572.) In 1974, we held that forcibly dragging a victim for a distance of 75 feet outside her home, without considering any other factors was a distance "insufficient to show that the movements were substantial." (*People v. Brown, supra,* 11 Cal.3d at p. 789 (*Brown*).) In 1980, in *Green, supra,* 27 Cal.3d at page 67, we found a 90-foot movement insufficient as a matter of law for the reasons stated in *Brown.*

Defendant committed the offenses in question in 1994. Accordingly, in determining whether there is sufficient evidence that the forcible movement in this case was for a substantial distance, we must apply "the holdings in *Brown* and *Green* in light of *Caudillo*." (*Martinez, supra,* 20 Cal.4th at p. 239.) Here, however, unlike the situation in *Martinez,* the record contains facts that satisfy the simple kidnapping asportation standard under the case law in effect in 1994.

In reaching this determination, we need not resolve whether Wong voluntarily left the Club with defendant as she called out to her girlfriend. As defendant and Wong walked outside, defendant, who was large and muscular, held both of Wong's arms, and he had forcibly and painfully grabbed the arm of a waitress earlier that evening while claiming he would take her to Las Vegas to marry her. We simply note that, although it appeared to Wong's friend that Wong left the Club voluntarily, the jury may have inferred that defendant used force or fear to propel Wong outside, and that she did not accompany him willingly at any point thereafter.

The Bergen Brunswig videotapes taken from its security cameras and the still photographs taken from those tapes captured some of defendant and Wong's movements after they left the Club. Taken at 1:23 a.m. on the morning of the murder, the first photograph captured an image of defendant and Wong walking through the company's north gate. The two appear to be walking side by side, but it is unclear whether they were holding hands or whether defendant's left hand was gripping Wong's right arm. On the other hand, a jury could reasonably find beyond a reasonable doubt that the second photograph, taken at 1:24 a.m., only six seconds later, depicts defendant forcibly pulling Wong away from the Club and towards her death in the company's lot. Wong's body was behind defendant's and her legs appear to be pulling backwards while her head was very close to defendant's neck and shoulder. Although defendant's left arm cannot be seen, a jury could reasonably conclude from the relationship between the two bodies and from the

events that occurred thereafter that defendant was controlling Wong's movements with that arm and moving her forward against her will.[8]

The surveillance cameras subsequently captured images of defendant and Wong in the area of the short flight of steps leading to the enclosure in which Wong was murdered. Defendant can be seen standing over Wong, walking backwards, and dragging her into the enclosure.[9] The distance between the area near the north gate depicted in the second photograph where defendant could be forcibly moving Wong away from the Club and the location of Wong's body inside the enclosure was 245 feet.

"Even if the victim's initial cooperation is obtained without force or the threat of force, kidnaping occurs if the accused ' "subsequently restrains his victim's liberty by force and compels the victim to accompany him further." ' [Citations.]" (*People v. Alcala* (1984) 36 Cal.3d 604, 622 [205 Cal.Rptr. 775, 685 P.2d 1126].) Here, as in *Alcala,* defendant was a "virtual stranger" (*id.* at p. 622), and the jury reasonably could infer that Wong did not voluntarily accompany defendant farther away from the Club once he began forcing her to move in that direction. The jury could reasonably determine that the second photograph depicts defendant forcibly moving Wong towards the enclosure in which he killed her. Accordingly, a reasonable jury could find that defendant forcibly moved Wong at least 245 feet.

The *Caudillo* court impliedly held that movement of 200 feet *could* support a simple kidnapping conviction when it noted that its "factual situation most nearly resembles those encountered in *Brown* (a movement of approximately 75 feet), *Thornton* (a movement within the confines of a single room), and *Cotton* (a movement within various rooms of a [barracks] and an additional 15 feet outside), than those found in *Stanworth* (a movement of a quarter of a mile), and *Stender* (a movement of 200 feet)." (*Caudillo, supra,* 21 Cal.3d at p. 574.)[10] Accordingly, forcibly moving a victim a distance of 245 feet would support a simple kidnapping conviction at the time of defendant's offenses.

---

[8] Throughout the remainder of this opinion, we refer to these two photographs as the "first" or "second" photograph based on the order in which they were taken.

[9] Defendant concedes the surveillance videotape and the physical evidence of scuff marks on the ground establish that he started "dragging" Wong from the foot of the stairs leading into the enclosure. An earring, a button, a pendant, and hair were found in four separate places between the steps and Wong's body, and injuries to Wong's right arm, right elbow, and her buttocks are consistent with her having been dragged across the concrete surface while she was alive.

[10] The cases referred to are *Brown, supra,* 11 Cal.3d 784, *People v. Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], *People v. Stanworth, supra,* 11 Cal.3d 588, *Cotton v. Superior Court* (1961) 56 Cal.2d 459 [15 Cal.Rptr. 65, 364 P.2d 241], and *Stender, supra,* 47 Cal.App.3d 413, 423.

We therefore conclude that sufficient evidence supports defendant's kidnapping conviction, his murder conviction under the kidnapping-felony-murder theory, and the finding of a kidnapping-murder special circumstance.

### D. *Murder Instructions*

The indictment charged defendant with murdering Wong willfully and unlawfully and with malice aforethought in violation of section 187, subdivision (a). No count specifically alleged first degree murder in violation of section 189.

Defendant contends the trial court erred by instructing the jury "on the *separate uncharged crimes* of first degree premeditated murder and first degree felony murder in violation of Penal Code section 189." (Italics added.) Defendant claims this error violated various state and federal constitutional rights.

■ We previously held that a defendant may be convicted of first degree murder even though the indictment or information charged only murder with malice in violation of section 187. (*People v. Hughes* (2002) 27 Cal.4th 287, 368–370 [116 Cal.Rptr.2d 401, 39 P.3d 432] (*Hughes*). Defendant claims our holding in *Hughes* is incorrect in light of our prior determination that section 189, rather than section 187, is the "statutory enactment of the first degree felony-murder rule in California." (*People v. Dillon* (1983) 34 Cal.3d 441, 472 [194 Cal.Rptr. 390, 668 P.2d 697].) *Hughes* rejected the defendant's premise that under *Dillon* "felony murder and premeditated murder are separate crimes, and that *Dillon* implicitly overruled *People v. Witt* (1915) 170 Cal. 104 [148 P. 928], in which we held that a defendant may be convicted of felony murder even though the information charged only murder with malice." (*Hughes, supra*, 27 Cal.4th at p. 369.) We continue to reject, "as contrary to our case law, the premise underlying defendant's assertion that felony murder and malice murder are two separate offenses." (*Hughes, supra*, 27 Cal.4th at p. 370.) We recently cited *Hughes* with approval on this very issue. (*People v. Geier* (2007) 41 Cal.4th 555, 591–592 [61 Cal.Rptr.3d 580].) We therefore reject defendant's interrelated claims that the trial court lacked jurisdiction to try him for first degree murder and improperly instructed on theories of first degree murder. To the extent that defendant claims he received inadequate notice of the prosecution's theory of the case, we have explained that "generally the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing or at the indictment proceedings." (*People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Here, the indictment alleged that the murder was committed under the special circumstances of murder in the course of kidnapping and unlawful penetration by a foreign object. Those

allegations provided notice that the prosecutor would proceed under a felony-murder theory. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1131–1132 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

■ As for defendant's separate claim that a unanimity instruction should have been given, we find no reason to depart from our cases that have "repeatedly rejected this contention, holding that the jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. [Citations.]" (*People v. Nakahara* (2003) 30 Cal.4th 705, 712 [134 Cal.Rptr.2d 223, 68 P.3d 1190] (*Nakahara*).) Here, as in *Nakahara,* we "are not persuaded otherwise by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. There, the United States Supreme Court found a constitutional requirement that any *fact* that increases the maximum penalty for a crime, other than a prior conviction, must be formally charged, submitted to the fact finder, treated as a criminal element, and proved beyond a reasonable doubt. [Citation.] We see nothing in *Apprendi* that would require a unanimous jury verdict as to the particular *theory* justifying a finding of first degree murder. [Citation.]" (*Nakahara, supra,* 30 Cal.4th at pp. 712–713.)

Apart from *Apprendi,* defendant relies on two recent state cases to assert that, "because felony-murder and malicious, premeditated murder have different elements in California, they are different crimes, not merely two theories of the same crime." (See *People v. Seel* (2004) 34 Cal.4th 535 [21 Cal.Rptr.3d 179, 100 P.3d 870]; *Burris v. Superior Court* (2005) 34 Cal.4th 1012 [22 Cal.Rptr.3d 876, 103 P.3d 276].) However, neither *Seel* nor *Burris* implicitly or explicitly overruled the language in *Hughes* and *Nakahara* reaffirming our cases that have held that felony murder and premeditated murder are not separate crimes. (*Hughes, supra,* 27 Cal.4th at p. 370; *Nakahara, supra,* 30 Cal.4th at p. 712.) Here, as in *Hughes,* we "reject defendant's various claims that because the information charged him only with murder on a malice theory, and the trial court instructed the jury pursuant to both malice and a felony-murder theory, the general verdict convicting him of first degree murder must be reversed." (*Hughes, supra,* 27 Cal.4th at p. 370.)

> E. *Merger of Unlawful Penetration with a Foreign Object with the Resulting Homicide Within the Meaning of* People v. Ireland

The trial court instructed the jury that it could base a first degree felony-murder conviction and a special circumstance finding on an unintentional or accidental killing that occurred during the commission or attempted commission of kidnapping (§ 207) or unlawful penetration with a foreign object (§ 289). (CALJIC No. 8.21.) Defendant contends the instruction was

improper because the commission of section 289 in the present case "merged" with the resulting homicide within the meaning of *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580] (*Ireland*). On that basis, defendant claims unlawful penetration of Wong with a foreign object "could not serve as the predicate felony for a felony-murder conviction" or a special circumstance finding. We conclude the underlying felony proscribed by section 289 did not merge with the homicide in this case.

In *Ireland*, we adopted the merger rule that "had been developed in other jurisdictions as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or 'predicate') felony committed by the defendant was *assault*." (*People v. Hansen* (1994) 9 Cal.4th 300, 311 [36 Cal.Rptr.2d 609, 885 P.2d 1022] (*Hansen*).)

The defendant in *Ireland* shot and killed his wife. The jury was instructed that it could return a second degree felony-murder verdict based on the underlying felony of assault with a deadly weapon. We reversed the defendant's conviction for second degree murder on the basis that an assault with a deadly weapon which was "an integral part of" and "included *in fact*" within the homicide could not support a second degree felony-murder instruction. (*Ireland, supra,* 70 Cal.2d at p. 539.) We reasoned that "[t]his kind of bootstrapping" was not permissible because "[t]o allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides." (*Ibid.*)

Two years later, we clarified that an *Ireland* inquiry "must extend to an investigation of the purpose of the [underlying] conduct" that resulted in a homicide and that the felony-murder rule could apply when there is an "independent felonious purpose" apart from the intent to "inflict[] . . . bodily injury." (*People v. Burton* (1971) 6 Cal.3d 375, 387 [99 Cal.Rptr. 1, 491 P.2d 793] (*Burton*); see also *People v. Mattison* (1971) 4 Cal.3d 177, 185 [93 Cal.Rptr. 185, 481 P.2d 193].)

*Hansen,* which was decided after the offenses in this case, explained that, while many cases properly have applied *Ireland*'s merger rule to other felonies that involve assault or assault with a deadly weapon, "with respect to certain inherently dangerous felonies, their use as the predicate felony supporting application of the felony-murder rule will not elevate all felonious assaults to murder or otherwise subvert the legislative intent." (*Hansen, supra,* 9 Cal.4th at p. 315.) In holding that discharging a firearm at an inhabited dwelling house (§ 246) did not merge with the resulting homicide, we

concluded that application of the second degree felony-murder rule "would not result in the subversion of legislative intent. Most homicides do not result from violations of section 246, and thus, unlike the situation in *People v. Ireland, supra*, 70 Cal.2d 522, application of the felony-murder doctrine in the present context will not have the effect of 'preclud[ing] the jury from considering the issue of malice aforethought . . . [in] the great majority of all homicides.' [Citation.] Similarly, application of the felony-murder doctrine in the case before us would not frustrate the Legislature's deliberate calibration of punishment for assaultive conduct resulting in death, based upon the presence or absence of malice aforethought. . . . [A]pplication of the felony-murder rule, when a violation of section 246 results in the death of a person, clearly is consistent with the traditionally recognized purpose of the second degree felony-murder doctrine—namely the deterrence of negligent or accidental killings that occur in the course of the commission of dangerous felonies." (*Hansen, supra*, 9 Cal.4th at p. 315.)

■ In the present case, we find the reasoning in *Hansen* equally persuasive when a violation of section 289 results in the death of a person. Similarly, applying the *Burton* analysis, we conclude a violation of section 289 does not "merge" with a resulting homicide within the meaning of the *Ireland* doctrine because unlawful penetration with a foreign object has an independent felonious purpose, namely, to sexually arouse, gratify or abuse.

We reject defendant's attempt to compare unlawful penetration with a foreign object (§ 289) to felony abuse involving willful infliction of physical pain on a child under circumstances likely to produce great bodily harm or death (§ 273a). A violation of section 273a merges with a resulting homicide because the offense is a close variant of assault by means likely to produce great bodily injury or death, which is similar to a violation of section 245 (assault by means likely to produce great bodily injury or death or assault with a deadly weapon), the traditional *Ireland* merger situation. (*People v. Smith* (1984) 35 Cal.3d 798 [201 Cal.Rptr. 311, 678 P.2d 886].) In *Smith*, we reasoned that "[i]t would be wholly illogical to allow this kind of assaultive child abuse to be bootstrapped into felony murder merely because the victim was a child rather than an adult, as in *Ireland*." (*Id*. at p. 806.) Here, by contrast, a violation of section 289 embodies a separate felonious purpose apart from the intent to injure or kill, and the evidence that defendant exposed Wong's breasts and bit one of her nipples amply supports a finding that defendant penetrated her genital area with at least one of the three sexual intents set forth in the statute.

Under either the rationale set forth in *Hansen* or that set forth in *Burton*, we conclude the offense of unlawful penetration of a foreign object does not "merge" with a resulting homicide within the meaning of the *Ireland*

doctrine, the offense will support a conviction of first degree felony murder, and the trial court properly instructed the jury on a first degree felony-murder theory based on the underlying felony of unlawful penetration with a foreign object. These conclusions undermine defendant's remaining claims that his state and federal rights to due process of law and a fair trial were violated because the jury was allowed to convict him "of a nonexistent crime," he "was arbitrarily deprived the benefit of the merger doctrine," and the jury received an "erroneous instruction" that permitted it "to convict [him] of first degree murder without finding malice." (See U.S. Const., 6th, 14th & 16th Amends.; Cal. Const., art. I, §§ 7, 14 & 15.)

We do not find that *Hansen* established a more restrictive standard than existed at the time of defendant's offenses; in any event, we rely independently on *Burton*, a 1971 case, in reaching our conclusion that the *Ireland* merger doctrine does not apply. Accordingly, we reject defendant's claim that application of *Hansen* to him may violate the prohibition against ex post facto laws (U.S. Const., art. I, § 10; Cal. Const., art. I, § 9), and deny him due process of law (U.S. Const., 14th Amend.; Cal. Const., art. I, §§ 7, 15).

### F. *Reasonable Doubt and Related Instructions*

Defendant contends there were unconstitutional defects in various instructions that discussed the People's burden of proof. He claims these instructions "undermined the reasonable doubt requirement" and thereby violated his rights to due process, trial by jury, a reliable capital trial, and the privilege against self-incrimination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.) We reject each of these claims.

Defendant asserts that four related instructions (CALJIC Nos. 2.01, 2.02, 8.83 & 8.83.1), essentially told the jurors they had a duty to accept the reasonable interpretation of evidence and reject the unreasonable interpretation. He claims these instructions improperly "compelled" the jury to find him guilty on all counts and to find the alleged special circumstances to be true "using a standard lower than proof beyond a reasonable doubt." He also claims the instructions created an "impermissible mandatory presumption" in cases in which a reasonable interpretation of evidence points toward guilt and that they therefore "improperly shifted the burden of proof to [him]." We repeatedly have rejected these contentions and find no reason to reconsider them. (See *Nakahara, supra*, 30 Cal.4th at p. 714.)

Defendant claims six other instructions (CALJIC Nos. 1.00, 2.21.2, 2.22, 2.51, 2.52 & 8.20) "collectively diluted the constitutionally-mandated standard of proof beyond a reasonable doubt." We rejected this challenge to each of the listed instructions except for CALJIC No. 2.52 (evidence of flight may

establish consciousness of guilt) in *Nakahara*. (*Nakahara, supra*, 30 Cal.4th at pp. 714–715.) We rejected this claim with regard to CALJIC No. 2.52 in *People v. Boyette* (2002) 29 Cal.4th 381, 438–439 [127 Cal.Rptr.2d 544, 58 P.3d 391] (*Boyette*). We find no reason to reach a different conclusion in this case. Each of the six challenged instructions "is unobjectionable when, as here, it is accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." (*Nakahara, supra*, 30 Cal.4th at p. 715.)

### G. *Consciousness of Guilt Instructions*

Defendant contends the three instructions that permitted an inference of his consciousness of guilt (CALJIC Nos. 2.03, 2.04 & 2.52) "unfairly highlighted evidence favorable to the prosecution and invited the jury to draw critical but irrational inferences against [him]." He claims the instructions, singly or in combination, deprived him of due process, equal protection, a fair jury trial, and a fair and reliable jury determination of guilt, special circumstances, and penalty. (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.)

Defendant acknowledges that we have rejected similar arguments in prior cases. (See, e.g., *Hughes, supra*, 27 Cal.4th at p. 348, *Boyette, supra*, 29 Cal.4th at pp. 438–439.) We find our reasoning in those cases to be sound.

### III. PENALTY PHASE ISSUES

#### A. *Validity of Statute That Enacted the Unlawful Penetration Special Circumstance*

Defendant contends the unlawful penetration special circumstance was not validly enacted by Proposition 115 because the electorate enacted Proposition 114 at the same time with more votes, the two propositions were in conflict, and Proposition 114, in contrast to Proposition 115, did not add a special circumstance of murder during the commission of unlawful penetration with a foreign object. Defendant's contention fails because the two propositions were not in conflict.

Proposition 114 modified the special circumstance for murdering a peace officer by expanding the definition of peace officer, while Proposition 115 made comprehensive reforms to the criminal justice system, including the addition of the special circumstance of murder during the commission of unlawful penetration with a foreign object. (See *Yoshisato v. Superior Court* (1992) 2 Cal.4th 978, 982–987 [9 Cal.Rptr.2d 102, 831 P.2d 327] (*Yoshisato*).)

In *Yoshisato*, we examined both propositions and concluded they "were not expressly or even impliedly presented to the voters as competing or alternative measures." (*Yoshisato, supra*, 2 Cal.4th at p. 989.) Instead, we found the propositions were "presented to the voters as complementary or supplementary (i.e., noncompeting) measures." (*Id.* at p. 988.) In turn, we concluded the petitioner in *Yoshisato* could "properly be charged with the '[r]ape by instrument' special circumstance added to section 190.2, subdivision (a)(17) by Proposition 115." (*Id.* at p. 992.)

For the reasons stated in *Yoshisato*, we similarly conclude that defendant was properly charged with the "unlawful penetration with a foreign object" special circumstance added to section 190.2, subdivision (a)(17) by Proposition 115.

■ ˙ We are not persuaded by defendant's concomitant claim that the capital statutory scheme, as expanded by Proposition 115, violates the Fifth, Eighth and Fourteenth Amendments because the scheme no longer is constitutionally narrow. In rejecting this identical claim with respect to the death penalty scheme applicable to this case, we explained that "[b]ecause the special circumstances listed in section 190.2 apply only to a subclass of murderers, not to all murderers [citation], there is no merit to defendant's contention . . . that our death penalty law is impermissibly broad." (*People v. Beames* (2007) 40 Cal.4th 907, 934 [55 Cal.Rptr.3d 865, 153 P.3d 955], citing *Tuilaepa v. California* (1994) 512 U.S. 967, 971–972 [129 L.Ed.2d 750, 114 S.Ct. 2630].) We find, no reason to reach a different conclusion in this case.

We similarly reject defendant's claim that, because section 190.2 was "blend[ed] together" from the provisions of Propositions 114 and 115, the resulting statute lacked the "societal consensus" essential to a valid death penalty law. As noted above, a majority of the voters intended to amend section 190.2 in two distinct and complementary ways. Section 190.2 accurately reflects the societal consensus in that regard.

### B. *Propriety of Alleging Multiple Felony-murder Special Circumstances*

Defendant contends "the plain language of section 190.2 prohibits the finding of more than one *felony-murder special circumstance* per homicide." Citing the Eighth and Fourteenth Amendments to the United States Constitution, he claims this error denied him the right to a fair penalty trial, a fair penalty determination, and "the benefit of a state-created right and a sentence imposed in accordance with state law." Although we reverse one of the two special circumstances in this case, we assess the merits of the claim to

determine whether defendant may again face a kidnapping-murder special-circumstance allegation based on his murder of Leanora Wong. (*People v. Hayes, supra,* 52 Cal.3d 577.)

 The indictment in this case alleged two distinct special circumstances. It alleged that defendant murdered Wong (1) during the commission or attempted commission of a kidnapping (§ 190.2, former subd. (a)(17)(ii)), and (2) during the commission or attempted commission of an unlawful penetration with a foreign object (§ 190.2, former subd. (a)(17)(xi)). As we previously have explained, "[o]nly a strained construction of the language of [section 190.2] would support a conclusion that section 190.2[, subdivision] (a)(17) permits only one special circumstance finding regardless of the number of felonies in which a defendant was engaged at the time of a murder. Unlike the multiple-murder special circumstances considered in *People v. Allen* [(1986)] 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], the felony-murder special circumstance does not rely on the same offense for each special circumstance charged. Separate special circumstance findings based on separate underlying felonies do not, therefore, create a risk of arbitrary imposition of the death penalty based on the number of special circumstances rather than the conduct underlying each." (*People v. Holt* (1997) 15 Cal.4th 619, 682 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

The hypothetical scenarios defendant sets forth are distinguishable from his own situation because each posits a scenario in which the defendant committed a single special circumstance on multiple occasions rather than the situation here, in which defendant was alleged to have committed two distinct special circumstances, each of which " 'involved violation of [a] distinct interest that society seeks to protect.' " (*People v. Sanders* (1990) 51 Cal.3d 471, 529 [273 Cal.Rptr. 537, 797 P.2d 561].) In the latter situation, a defendant " 'may be deemed more culpable than a defendant who commits only one [special circumstance].' " (*Id.* at p. 529.) Defendant's suggestion that no distinct societal interests were involved because both felonies were "crimes of violence against the person" ignores the distinction between crimes that violate an individual's freedom of movement and those which violate an individual's freedom from unsolicited and violent sexual invasions. We conclude the indictment properly alleged two felony-murder special circumstances.

## C. *Evidence of Unadjudicated Criminal Activity*

 Defendant contends the trial court erred by introducing evidence at the penalty phase of unadjudicated criminal activity pursuant to section 190.3, factor (b) (factor (b)), which permits the jury to consider in aggravation "[t]he presence or absence of criminal activity by the defendant other than the crime

for which the defendant has been tried in the present proceedings, which involve the use or attempted use of force or violence or the expressed or implied threat to use force or violence." He argues that factor (b) should have required a separate jury from the jury that determined guilt, juror unanimity on the presence of the unadjudicated criminal activity beyond a reasonable doubt, instruction on the elements of the prior crimes, exclusion of all prior criminal activity on the ground that it introduced "irrelevant and improper considerations factors into the sentencing calculus," exclusion of some prior criminal activity based on the statute of limitations, and exclusion of unadjudicated criminal activity that was dismissed pursuant to a plea bargain. Defendant claims this evidentiary error deprived him of "his rights to due process, a fair and speedy trial by an impartial and unanimous jury, the presumption of innocence, effective confrontation of witnesses, effective assistance of counsel, equal protection, the guarantee against double jeopardy, and a reliable and nonarbitrary penalty determination, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and their California counterparts." We have rejected these interrelated contentions and continue to do so in this case. (See *Hillhouse, supra*, 27 Cal.4th at p. 507 & cases cited therein.) The penalty phase is " 'intended to place before the sentencer all evidence properly bearing on its decision under the Constitution and statutes. Prior violent criminality is obviously relevant in this regard; the reasonable doubt standard ensures reliability; and the evidence is thus not improperly prejudicial or unfair.' [Citations.]" (*Ibid.*)

### D. *Instruction on Appropriate Use of Victim Impact Evidence*

Defendant does not challenge the admission of the victim impact testimony that included the various ways in which Wong's mother, father, and brother were adversely affected by losing her from their family. Defendant contends the trial court was required to give a sua sponte limiting instruction on how the jury should approach victim impact evidence presented at the penalty phase in order to ensure that "emotion would [not] overcome the jurors' reason, preventing them from making a rational penalty decision . . . ." We disagree.

The instructions the trial court gave, which included CALJIC No. 8.84.1, were sufficient to inform the jury of its responsibilities, and the proposed instruction by the defense "would not have provided the jury with any information it had not otherwise learned from CALJIC No. 8.84.1." (*People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78].)

E. *Constitutionality of Instructions Defining Scope of Jury's Sentencing Discretion and the Nature of Its Deliberative Process*

Defendant contends the standard jury instruction (based on CALJIC No. 8.88) defining the scope of the jury's sentencing discretion and the nature of its deliberative process is unconstitutional for various reasons. We adhere to the decisions that have rejected similar claims, and decline to reconsider such authorities, as follows:

*1. Reference to "substantial" aggravating circumstances*—Defendant claims that the instruction (CALJIC No. 8.88) impermissibly asked the jury to decide whether "the aggravating circumstances are so substantial in comparison with mitigating circumstance" as to justify the death penalty. Defendant argues the phrase "so substantial" is too vague to give adequate guidance to the jurors, but our case law disagrees. (E.g., *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 124 [17 Cal.Rptr.3d 710, 96 P.3d 30]; *People v. Breaux* (1991) 1 Cal.4th 281, 315–316 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

*2. Failure to instruct the jury to return a verdict of life imprisonment if aggravating factors do not outweigh mitigating ones*—Defendant contends the instruction based on CALJIC No. 8.88 failed to tell the jurors that they were required to impose a verdict of life imprisonment without parole if aggravating factors do not outweigh mitigating ones. We have rejected this argument and see no reason to reconsider it here. (E.g., *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 124; *People v. Kipp* (1998) 18 Cal.4th 349, 381 [75 Cal.Rptr.2d 716, 956 P.2d 1169].)

*3. Failure to instruct jury that it could impose life even if factors in aggravation outweighed those in mitigation*—Defendant contends the court's sentencing instruction based on CALJIC No. 8.88 failed to tell the jurors that they could return a life sentence even if they found that the factors in aggravation outweighed those in mitigation. Defendant's jury was instructed that "[a]ny of the mitigating factors, standing alone, may support a decision that death is not the appropriate punishment in this case, if you find that the weight of such a single mitigating factor outweigh[s] all aggravating factors." Defendant was not entitled to a specific instruction that the jury may choose life without possibility of parole even if it finds the aggravating circum-

stances outweigh those in mitigation. (*People v. Kipp, supra*, 18 Cal.4th at p. 381; *People v. Medina* (1995) 11 Cal.4th 694, 781–782 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

*4. Failure to inform jury that defendant had no burden to persuade the jurors that death was not an appropriate penalty*—Defendant contends the instruction based on CALJIC No. 8.88 was constitutionally inadequate because it failed to instruct the jury that he had no burden to persuade them that the death penalty was inappropriate in this case. Again, we have rejected the contention and continue to do so here. (E.g., *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 124.) Implicit in the sentencing instructions is that the determination of penalty is "essentially moral and normative [citation], and therefore . . . there is no burden of proof or burden of persuasion. [Citation.]" (*People v. Hayes, supra*, 52 Cal.3d at p. 643.)

### F. *Constitutionality of the Death Penalty Statute*

Defendant raises additional constitutional challenges to California's death penalty statute. He recognizes that this court previously has rejected these arguments, but he raises them "to allow this Court to reconsider its prior rulings and to preserve the claims for federal review." We find no reason to reconsider our prior holdings, as follows:

1. Section 190.3, factor (a), is not unconstitutionally overbroad, arbitrary, capricious, or vague, whether on its face (*People v. Guerra* (2006) 37 Cal.4th 1067, 1165 [40 Cal.Rptr.3d 118, 129 P.3d 321]) or as applied to defendant.

2. The use of such adjectives in the sentencing factors as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.*, factor (g)) is constitutional. (*People v. Avila* (2006) 38 Cal.4th 491, 614 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

3. The death penalty law is not unconstitutional for failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating circumstances, or the appropriateness of a death sentence. (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244].) Except for factor (b), no burden of proof is constitutionally required at the penalty phase. (*People v. Moon* (2005) 37 Cal.4th 1, 43 [32 Cal.Rptr.3d 894, 117 P.3d 591].) *Apprendi v. New Jersey, supra*, 530 U.S. 466, has not changed our prior conclusions regarding burden of proof. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1068 [47 Cal.Rptr.3d 467, 140 P.3d 775].)

4. The death penalty law is not unconstitutional for failing to require an instruction on the presumption of life. (*People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

5. There is no constitutional requirement that the jury find aggravating factors unanimously. (*People v. Osband* (1996) 13 Cal.4th 622, 709–710 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Neither *Apprendi v. New Jersey, supra*, 530 U.S. 466, nor *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], has changed our prior conclusion regarding jury unanimity. (*People v. Lewis and Oliver, supra*, 39 Cal.4th at p. 1068.)

6. There is no constitutional requirement that the jury prepare written findings identifying the aggravating factors on which it relied. (*People v. Cook* (2006) 39 Cal.4th 566, 619 [47 Cal.Rptr.3d 22, 139 P.3d 492].)

7. The statutory scheme is not unconstitutional insofar as it does not contain disparate sentence review (i.e., comparative or intercase proportionality review). (*People v. Dickey* (2005) 35 Cal.4th 884, 931 [28 Cal.Rptr.3d 647, 111 P.3d 921].)

8. The guarantee of equal protection of the laws does not require this court to give capital defendants the same sentence review afforded other felons under the determinate sentencing law because the death penalty law "provides a different method of determining the sentence than is used in noncapital cases." (*People v. Smith* (2005) 35 Cal.4th 334, 374 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

## G. *Violation of International Law*

Defendant contends the death sentence violates international law. He claims California's death penalty scheme violates provisions of the International Covenant on Civil and Political Rights, a treaty which the United States ratified in 1992. He also claims use of the death penalty in this case violates international norms of humanity and decency reflected in the laws and practices of most civilized nations. In turn, he claims the death penalty constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments to our federal Constitution because "international law is part of our law."

We have rejected these interrelated claims and continue to do so. We reiterate that "[i]nternational law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements. [Citations.]" (*Hillhouse, supra*, 27 Cal.4th at p. 511; see also *People v. Elliot* (2005) 37 Cal.4th 453, 488 [35 Cal.Rptr.3d 759, 122 P.3d

968].) Nor does California's asserted status as being in the minority of jurisdictions worldwide that impose capital punishment, or this jurisdiction's asserted contrast with the nations of Western Europe in that we impose capital punishment and they purportedly either do not or do so only in exceptional circumstances, result in any violation of the Eighth Amendment to the federal Constitution. (*People v. Moon, supra*, 37 Cal.4th 1, 47–48.)

## H. *Effect of Partial Reversal*

We are reversing the simple kidnapping conviction and the kidnapping-murder special-circumstance finding. The partial reversal does not require setting aside the death judgment. The jury properly considered all of the evidence. Here, as in *Hillhouse, supra*, 27 Cal.4th 469, the jury was "well aware of the circumstances of [the victim's] murder. It would not have given significant independent weight to the kidnapping conviction itself rather than the overall circumstances of the capital crime and the aggravating and mitigating evidence. (*People v. Kelly* [(1992)] 1 Cal.4th [495,] 551 [3 Cal.Rptr.2d 677, 822 P.2d 385].)" (*Hillhouse, supra*, 27 Cal.4th at p. 512.) The question whether defendant forcibly moved his victim 37 feet or 245 feet to the location where he unlawfully penetrated her genital and anal areas, hit her head against the concrete, choked or strangled her, and ultimately murdered her, although critical to the kidnapping conviction at the time of defendant's offenses under *Caudillo,* was of little or no significance to the penalty determination. The possibility that defendant may have forcibly moved his victim 37 rather than 245 feet is hardly mitigating. We also note that the jury learned during the penalty phase that defendant had sexually attacked three other women besides Wong and had suffered three prior felony convictions based on those prior attacks. We see no reasonable possibility the difference in the number of feet defendant dragged his victim affected the penalty determination. (*People v. Bonilla* (2007) 41 Cal.4th 313, 334 [60 Cal.Rptr.3d 209, 160 P.3d 84] [second special circumstance "was superfluous for purposes of death eligibility and did not alter the universe of facts and circumstances to which the jury could accord . . . weight"]; see also *Brown v. Sanders* (2006) 546 U.S. 212, 222–223 [163 L.Ed.2d 723, 126 S.Ct. 884]; *Hillhouse, supra*, 27 Cal.4th at p. 512.)

## I. *Cumulative Effect of Errors During Penalty Phase*

Defendant contends the cumulative effect of the errors committed during the penalty phase was prejudicial. However, we have found no arguable error during the penalty phase. Accordingly, there is no error to cumulate.

## IV. DISPOSITION

We reverse the simple kidnapping conviction and the kidnapping-murder special circumstance and otherwise affirm the judgment.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied January 23, 2008.