Filed 10/26/20; Opinion on transfer from Supreme Court

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>JEFFREY SCOTT BARTON,<br><br>     Defendant and Appellant. | D072639<br><br><br><br>(Super. Ct. No. SCN331782) |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Reversed.

Robert E. Boyce, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Jeffrey Scott Barton of five counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2))[1] and one count of forcible sodomy (§ 286, subd. (c)(2)(A)).  However, the jury reached its verdict only after the trial court discharged a holdout juror, Juror No. 12, after it found she was refusing to deliberate.  Thereafter, the trial court sentenced Barton to a prison term of 48 years.

Barton appeals, contending, inter alia, that the trial court abused its discretion by discharging Juror No. 12 on the basis that she was refusing to deliberate.  Barton contends that the other jurors' testimony demonstrates only that Juror No. 12 disagreed with the other jurors, who found her to be unfriendly and unable to offer persuasive explanations for her opinion, *not* that she was unable or unwilling to deliberate.  We agree.  Under the heightened standard of review that applies to a trial court's decision to discharge a holdout juror for refusing to deliberate, we conclude the trial court's decision to discharge Juror No. 12 is not manifestly supported by evidence.  Accordingly, we need not address Barton's other contentions on appeal, other than his challenge to the sufficiency of the evidence, and reverse the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Given our discussion on appeal is focused on the discharge of Juror No. 12, we provide only a limited review of the underlying trial.  We will provide additional factual background in our discussion of Barton's challenge to the sufficiency of the evidence.

---

[1]     Penal Code section 288a was renumbered to section 287 after Barton's conviction.  All further statutory references are to the Penal Code unless otherwise specified.

In 1999, John Doe enrolled at the Army Navy Academy (Academy), a military boarding school in Carlsbad, California. At that time, Doe was 14 years old. Doe lived on campus in a cottage that housed multiple "cadets." Barton also lived on campus and was employed as the Director of Summer Programs. He was heavily involved with the cadets in various activities.

Barton was John Doe's homeroom teacher. After Doe enrolled, he and Barton soon developed a close relationship outside the classroom. In 2000, after an Academy staff member became suspicious about the relationship between Barton and Doe, Doe was interviewed but denied any molestation or inappropriate behavior by Barton. Around the same time, John Doe told his grandparents that Barton was abusing and molesting him. His grandparents did not take any action or report Doe's claim, telling him they thought he was falsely accusing Barton to get out of attending the Academy.

In 2013, over a decade after he left the Academy, Doe told his mother for the first time that Barton had molested him years earlier when he was a cadet. His mother called the police the next day. During an interview with the police, and then later at trial, Doe detailed multiple incidents in which Barton committed lewd acts and performed oral copulation and sodomy. Subsequent investigation discovered two additional victims in other states who testified that Barton molested them as children in the years before Barton met John Doe.

Based on those allegations, Barton was charged with 20 counts of various sexual crimes against three victims, Doe and two other boys at the Academy. At Barton's first trial, the jury found him not guilty of all but one of the counts arising from his alleged conduct regarding the other victims, and was unable to reach a verdict as to the remaining count and all the counts involving John Doe.

The People then filed an amended indictment charging Barton with 10 counts of forcible oral copulation (§ 288a, subd. (c)(2)) and one count of sodomy by force (§ 286, subd. (c)(2)(A)), all involving John Doe. The indictment alleged that it was filed within one year of a report by the victim to law enforcement claiming forcible oral copulation and forcible sodomy when the victim was under the age of 18, thereby satisfying the statute of limitations. (§ 803, subd. (f).)

At the second trial, the prosecution's case was largely premised on John Doe's testimony bolstered by his earlier statements to law enforcement. In his defense, Barton presented multiple witnesses who testified they never saw Barton act inappropriately toward his students. Barton was also able to highlight many inconsistencies and impossibilities in John Doe's testimony and statements regarding Barton's conduct. John Doe also acknowledged that he filed a lawsuit against the Academy premised on Barton's conduct and was seeking $1.79 million in damages.

In closing argument, Barton's counsel focused on contesting Doe's credibility. She argued that Doe's own grandparents did not believe him. She asserted that Doe concocted the story simply to obtain a "substantial amount of money" via his lawsuit.

Jury deliberations began on Thursday, May 25, but lasted only 16 minutes before recessing in the evening for the weekend. Deliberations resumed on Tuesday, May 30, when the jury deliberated for over five hours.

Early the next morning, after almost an additional hour of deliberations, the court received a note from Juror No. 6, asking: "Is it possible to proceed with an alternate juror if we suspect that a single juror is trying to nullify the rest of the jurors?"

4

The parties agreed that the court should conduct an inquiry. The court first questioned Juror No. 6, who indicated that Juror No. 12 was telling the other jurors that she would not change her opinion on Barton's guilt and was not engaging in further discussions. The court then allowed counsel to question Juror No. 6. Juror No. 6 clarified that Juror No. 12 would answer direct questions but was firm in her opinion. When questioned further, Juror No. 6 revealed that Juror No. 12 maintained that she did not believe John Doe.

The court and counsel then questioned Juror No. 12. She told the court she was not trying to nullify the jury's verdict and was willing to engage in discussion. Juror No. 12 indicated she felt strongly about the evidence and disagreed with the other jurors, but had listened to the others discuss the evidence. Based on this testimony, the court found that Juror No. 12 was not refusing to deliberate and no further questioning of the jury was necessary. The court instructed all the jurors to continue to deliberate.

The next morning, the court received another note from the jury, this time stating that "Juror No. 12 refuses to deliberate." The court indicated it would question all the jurors and allow counsel to ask questions.

The court called each juror individually for questioning in descending order. Juror No. 11 believed that Juror No. 12 had made up her mind "right from the get-go." After the court's initial questioning the day before, Juror No. 12 returned to the deliberations and asked to hear two of the transcripts from trial. Toward the end of the second transcript, Juror No. 11 observed Juror No. 12 yawning and believed "she had tuned out." Juror No. 11 testified that Juror No. 12 would not talk "freely, openly" about her feelings and was either unwilling or unable to answer questions posed by the other 11 jurors. During deliberations, Juror No. 12 would share her opinion with the

5

other jurors, but would not engage in further discussion. Juror No. 11 faulted Juror No. 12 with not being part of the "small talk" during breaks in the trial and that it seemed unusual that she was not part of the group.

Juror No. 10 agreed that Juror No. 12 was refusing to deliberate. Juror No. 12 initially appeared to be considering other opinions, but failed to give the other jurors reasons for her own opinions. Juror No. 10 further explained: "I think she honestly believes that she's sharing everything there is to share. But I don't think the rest of us feel that she is." Juror No. 10 explained that "Juror No. 12 has stated her opinion multiple times—but that's where it goes. But it's an opinion about one thing." Explaining further, Juror No. 10 stated that the other jurors communicated to Juror No. 12 that "[w]e want to know why you are thinking this because everybody else has said why they are thinking what they are thinking. And she maintains that she shouldn't have to defend her opinion." During deliberations, Juror No. 10 brought a document to Juror No. 12 to discuss, but Juror No. 12 refused to look at the document and said Juror No. 10 was being aggressive by standing over her. The other jurors continued to ask Juror No. 12 to elaborate on or clarify her position, but Juror No. 12 would respond by declaring she was "not on trial." Juror No. 10 explained that Juror No. 12 would answer "as if she feels she clarified her position . . . but it's still . . . not clear." The other jurors were "unsatisfied with her response." Juror No. 10 observed that Juror No. 12 sat apart from the other jurors at breaks during trial and, once deliberations began, Juror No. 12 did not laugh and joke with other jurors about "random" topics and did not "want to participate in friendly conversations."

Juror No. 9 agreed that Juror No. 12 was refusing to deliberate and stated that whereas "eleven of us have very carefully and systematically and

6

honestly gone through the evidence in a very logical, progressive way, . . . [Juror No. 12] will not express why she believes the way she does, as we all have." Juror No. 9 acknowledged that Juror No. 12 would answer questions, but "[s]he kept saying the same thing." As deliberations progressed, Juror No. 12 would respond to questions by saying " 'I've decided. I've made up my mind. I'm not going to change my mind. And I have nothing more to add.' " Juror No. 9 acknowledged Juror No. 12 went through her notes and the printed evidence "pretty well" at the start of deliberations, but "she commented very little on it." Juror No. 9 also expressed that Juror No. 12 was not very open to "chitchat."

Juror No. 8 agreed that Juror No. 12 was refusing to deliberate. Juror No. 8 explained that Juror No. 12 refused to give information to sway the other jurors to her point of view. Juror No. 12 was responding to questions from the other jurors, but Juror No. 8 believed the answers were nonresponsive to the questions. The other jurors were growing exasperated with Juror No. 12's repeated responses, telling her that "you've said this over and over again. We need to hear something different. We need to hear . . . why you're feeling this way." Juror No. 8 explained that during trial, Juror No. 12 would not talk with the other jurors and would physically separate herself during "breaks or in the deliberation room."

Juror No. 7 agreed Juror No. 12 was not deliberating. Juror No. 7 believed that Juror No. 12 had already made up her mind at the start of deliberations. Juror No. 7 further explained that Juror No. 12 was not participating in "our in-depth conversations" and had said "[a] handful of words, and that's it." Juror No. 12 would answer questions, but Juror No. 7 believed she was "not acting like a reasonable person." Explaining further, Juror No. 7 stated that although Juror No. 12 would share her opinion,

"[s]he's not giving us enough of an opinion to support anything."  Juror No. 7 denied that Juror No. 12 was physically separating herself during deliberations, noting that she was sitting at the head of the table.   However, Juror No. 12 separated herself outside the jury room.  Juror No. 7 faulted Juror No. 12 with not being friendly during trial and sitting off to the side instead of "joking and talking about life."

Juror No. 5 agreed that Juror No. 12 was refusing to deliberate.  Juror No. 5 indicated Juror No. 12 was looking at the evidence and verbally responding to questions, but failed to answer the questions posed.  Juror No. 12 would offer her opinion, but provide "no backup for the opinion."  Juror No. 5 noted that Juror No. 12 separated herself during the trial.

Juror No. 4 likewise agreed Juror No. 12 was not deliberating because "[s]he gives her opinion, but she doesn't want to explain why.  And it's difficult to have a discussion about it if she won't explain why."  Juror No. 4 stated that when deliberations started, Juror No. 12 "did give some—a reason.  And when we tried to dig deeper into those reasonings or give our reasonings for another view, that's when she started shutting down and not wanting to discuss it further."  Revealing Juror No. 12's reasoning, Juror No. 4 suggested that "she isn't believing one part of evidence to be true, she's discrediting the entire witness . . . ."  Juror No. 4 stated that at the start of deliberations, Juror No. 12 "right away, she gave her opinion.  And it hasn't changed."  Juror No. 4 acknowledged that Juror No. 12 verbally responded to questions, but agreed with the characterization that her answers were "not to the satisfaction of the eleven."  Like the other jurors, Juror No. 4 noticed that Juror No. 12 "wasn't involving herself in on our breaks or at lunch."

Juror No. 3 did not believe Juror No. 12 was deliberating because the other jurors had been trying to figure out Juror No. 12's point of view "[b]ut

8

she won't talk about it." Juror No. 3 agreed that when deliberations began, there was initially more of a dialogue with Juror No. 12 explaining her position. However, Juror No. 3 opined that Juror No. 12 had an opinion from the very beginning and was not willing to consider other viewpoints. Juror No. 3 acknowledged that Juror No. 12 looked at the physical evidence, listened to testimony, and consulted her notes. Although Juror No. 12 remained at the table during deliberations, she did not participate in the jurors' discussion. Juror No. 3 expressed frustration because Juror No. 12 had an "opinion with no facts or evidence behind it."

Juror No. 2 told the court that Juror No. 12 was "definitely" refusing to deliberate, with "no exchange of information." Juror No. 2 believed Juror No. 12 formed her opinion at the start of deliberations. Juror No. 12 would review the evidence and respond to questions, but "would not answer a yes-or-no question with a yes or no, ever." Juror No. 12 never stated that she was refusing to deliberate or to consider the law. While the other jurors were discussing the evidence, Juror No. 12 would "roll her eyes and look away." However, Juror No. 2 believed that Juror No. 12 was listening to the evidence and "engaged in that process." When discussing her own opinion, Juror No. 12 "wouldn't use any evidence to back up what she says." Juror No. 2 also noticed that Juror No. 12 distanced herself from the others throughout the trial and would not say hello or chat with the other jurors.

Juror No. 1 had the impression that Juror No. 12 was refusing to deliberate. Juror No. 1 further revealed Juror No. 12's opinion, explaining that "[i]t's easy [for Juror No. 12] to say, 'I don't believe John Doe.' But I can also then say, that I would ask, 'What about his testimony bothers you?' [¶] [Juror No. 12] absolutely will not answer the question. I mean totally will not answer." Juror No. 1 elaborated by stating that "[t]he purpose of

virtually every question that was directed to her was an attempt to get her to present any factual tidbit that caused her to take the position she was taking. In other words, "I don't believe John Doe." When asked to explain her opinion, Juror No. 12 would "go back and repeat her same words, " 'I just don't believe him.' " During a preliminary vote at the start of deliberations, Juror No. 12 told the other jurors that she was intending to vote "not guilty." Juror No. 1 did not believe Juror No. 12 considered the other jurors' viewpoints.

Juror No. 6 returned for questioning and still agreed Juror No. 12 was refusing to deliberate. On the last morning of deliberations, Juror No. 12 was refusing to deliberate further and, when questioned, affirmed that her opinion was set and that she was " 'going to vote the same way on everything no matter what evidence [the jurors] discuss.' " When asked, Juror No. 12 would refuse to list the evidence supporting her opinion. Juror No. 6 told the court that Juror No. 12 resisted making "small talk" during breaks in the trial and remained distant during deliberations.

The court concluded its inquiry by questioning Juror No. 12 and allowing counsel to ask questions. Juror No. 12 denied that she was refusing to deliberate and explained that "I am participating, I am deliberating, I am stating my side. I have been stating my side. I continue to state my side. Their side is opposite. That's the problem." Juror No. 12 stated that she was considering the evidence, but simply had a different view than the other jurors. She stated that she was considering the law and all the evidence when deliberating and had, to the best of her ability, answered the other jurors' questions. Juror No. 12 opined that the deliberation issues arose because she did not agree with the other jurors, who "believe that if they get an alternate, then that [alternate] will side with their side." Juror No. 12

10

acknowledged that she distanced herself from the other jurors during breaks in the trial, but only did so to avoid talking about the case. Juror No. 12 expressed that she thought she had engaged in the deliberative process, had initially explained her position, and had considered the viewpoints of the other jurors.

After hearing argument from counsel, the court made a series of findings based on its review of the jurors' testimony. The court noted that the jurors consistently described a process in which they all attempted to engage Juror No. 12 in discussing the case. Finding certain jurors more credible than others on different topics, but ultimately finding them all credible, the court accepted their testimony that Juror No. 12 did not have a fixed conclusion before the start of deliberations, but rather "started the process the same as everybody else did at the very beginning." However, the court found that Juror No. 12 quickly reached a fixed conclusion "at or near the beginning of deliberations." The court found Juror No. 12 refused to speak to the other jurors and, while unable to separate physically from the remaining jurors given the small size of the jury room, Juror No. 12 created a "sort of an emotional distance" from the other jurors. Based on these findings, the court concluded Juror No. 12 was refusing to deliberate and discharged her pursuant to section 1089. Barton's counsel immediately moved for a mistrial, which the court summarily denied.

The court replaced Juror No. 12 with an alternate juror. After less than five hours of deliberations, the newly constituted jury found Barton guilty of six counts and not guilty of five counts. Thereafter, the court sentenced Barton to consecutive terms of eight years on each of the six counts, for a total determinate prison term of 48 years. Barton filed a timely appeal.

DISCUSSION

I

DISCHARGE OF JUROR NO. 12

Barton's first argument on appeal challenges the trial court's discharge of Juror No. 12. "[S]ection 1089 sets forth the procedure for removing a sitting juror." (*People v. Boyette* (2002) 29 Cal.4th 381, 462.)  It provides, in relevant part, as follows:  "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court may order the juror to be discharged . . . ."  (§ 1089.)  Good cause exists to discharge a juror when the juror loses his or her ability to render a fair and impartial verdict based on the evidence presented at trial.  (*People v. Warren* (1986) 176 Cal.App.3d 324, 327.)

In most circumstances, section 1089 is applied to remove a juror "who becomes physically or emotionally unable to continue to serve as a juror due to illness or other circumstances."  (*People v. Cleveland* (2001) 25 Cal.4th 466, 474 (*Cleveland*).)  However, section 1089 also has been applied "to permit the removal of a juror who refuses to deliberate, on the theory that such a juror is 'unable to perform his duty.' "  (*Id.* at p. 475.)

In *Cleveland*, the Supreme Court urged that "caution must be exercised" in removing a juror for refusing to deliberate "to protect the sanctity of jury deliberations."  (*Cleveland*, *supra*, 25 Cal.4th at p. 475.)  Later, in *People v. Armstrong* (2016) 1 Cal.5th 432 (*Armstrong*), the Supreme Court reminded trial courts "that the removal of a seated juror for failing to deliberate is a serious matter that implicates a defendant's state and federal constitutional right to a unanimous decision by the jury."  (*Id.* at p. 454.)

Given this need for caution, both the trial court's discretion and our review of the trial court's decision is subject to a heightened standard. "Removing a juror is, of course, a serious matter . . . . While a trial court has broad discretion to remove a juror for cause, it should exercise that discretion with great care." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052, fn. omitted (*Barnwell*).) An appellate court's "review of the decision to remove a seated juror is not conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*People v. Fuiava* (2012) 53 Cal.4th 622, 711 (*Fuiava*); see also *Armstrong*, *supra*, 1 Cal.5th at pp. 453-454.) Our Supreme Court explained in *Fuiava*: "The typical abuse of discretion standard involves an analysis of whether the trial court's decision is supported by ' "substantial evidence," ' and 'has been characterized as a "deferential" standard.' " (*Fuiava*, at p. 711.) "Even when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding." (*Ibid*.) In contrast, " '[t]he demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as a trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror] was established.' " (*Id*. at p. 712.) Under the demonstrable reality standard, reviewing courts "must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Barnwell*, at p. 1053.) In reaching that conclusion, this court considers "not just the evidence itself, but also the record of reasons the court provides." (*Ibid*.) The "heightened" and "more stringent" demonstrable reality standard "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process

and to a fair trial by an unbiased jury." (*Id.* at p. 1052; see also *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71 (*Allen*).)

"As we have consistently cautioned, however, even under the demonstrable reality standard the reviewing court does *not* reweigh the persuasive value of the evidence." (*Fuiava*, *supra*, 53 Cal.4th at p. 714, italics added.) "[E]ven when there is conflicting evidence . . . an appellate court must recognize that it is for the trial court to 'weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings,' and the reviewing court must 'defer to factual determinations based on these assessments.' " (*Ibid.*) Accordingly, reviewing courts must defer to the trial court's assessments of a juror's credibility or mental and physical conditions, "based 'on firsthand observations unavailable to us on appeal.' " (*People v. Powell* (2018) 6 Cal.5th 136, 156 [mental and physical conditions]; *Barnwell*, *supra*, 41 Cal.4th at p. 1053 [credibility].)

Here, the trial court discharged Juror No. 12 after following the procedures set forth by the Supreme Court in *Cleveland.* Initially, a court should conduct a reasonable inquiry into allegations of misconduct " 'where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties and would justify his removal from the case.' " (*Cleveland*, *supra*, 25 Cal.4th at p. 478.) Before conducting such an inquiry, "it often is appropriate for a trial court that questions whether all of the jurors are participating in deliberations to reinstruct the jurors regarding their duty to deliberate and to permit the jury to continue deliberations before making further inquiries that could intrude upon the sanctity of deliberations. It also is clear . . . that when reinstruction does not resolve the problem and the court is on notice that there may be

14

grounds to discharge a juror during deliberations, it must conduct 'whatever inquiry is reasonably necessary to determine' whether such grounds exist." (*Id.* at p. 480.)

If the court proceeds to conduct a further inquiry, it "must take care in inquiring into the circumstances that give rise to a request that a juror be discharged, or an allegation that a juror is refusing to deliberate, lest the sanctity of jury deliberations too readily be undermined." (*Cleveland, supra,* 25 Cal.4th at p. 484.) A trial court must take care to not require disclosure of the content of jury deliberations because a juror's verbal reflection of the reasons for his or her vote would improperly disclose the juror's mental processes. (*Id.* at pp. 484-485.) The inquiry should be limited in scope, focus on the conduct of the jurors rather than the content of deliberations, and "should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists." (*Id.* at p. 485.) To limit the scope of the inquiry, the *Cleveland* court instructed that "permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted." (*Ibid.*)

During the inquiry, the court should focus on determining whether the jurors' testimony supports the conclusion that a juror is refusing to deliberate. "A refusal to deliberate consists of a juror's unwillingness to engage in the deliberative process; that is, he or she will not participate in discussions with fellow jurors by listening to their views and by expressing his or her own views. Examples of refusal to deliberate include, but are not limited to, expressing a fixed conclusion at the beginning of deliberations and refusing to consider other points of view, refusing to speak to other jurors,

15

and attempting to separate oneself physically from the remainder of the jury. The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge.

A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.)

Applying the general principles and procedures set forth in *Cleveland*, the trial court below first instructed the jury on its continued duty to deliberate after receiving the first note. It was only after receiving another note the following day that the court determined that a further inquiry was warranted. The court, however, failed to heed the Supreme Court's warning that "permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) Rather than leading its own inquiry, the trial court largely abdicated the questioning to the attorneys. While this alone is not prejudicial error, it likely shaped the inquiry and framed the trial court's ultimate decision.

All of the 11 other jurors offered their opinion that Juror No. 12 was refusing to deliberate and, based on this testimony, the trial court found that Juror No. 12 was unable to "participate in discussion with fellow jurors"; had a "fixed conclusion . . . at or near the beginning of the deliberations";

16

"refus[ed] to consider other points of view"; "refus[ed] to speak with other jurors"; and that while she had not physically separated from the other jurors given the small jury room, she created a "sort of an emotional distance" from the other jurors.

Although these factors were generally recognized in *Cleveland* as supporting a conclusion that a juror is refusing to deliberate, we are not "confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied." (*Barnwell*, *supra*, 41 Cal.4th at p. 1053.)

Although the jurors all offered their ultimate opinion that Juror No. 12 was refusing to deliberate, "a trial court should be wary of relying on the *opinions* of jurors, rather than on its own consideration of objective facts." (*Allen*, *supra*, 53 Cal.4th at p. 75.) Instead of reaching a conclusion premised on the other jurors' opinions, the court "should focus on its own consideration of a juror's *conduct*." (*Ibid.*) "It is difficult enough for a trial court to determine whether a juror actually is refusing to deliberate or instead simply disagrees with the majority view. [Citations.] Drawing this distinction may be even more difficult for jurors who, confident of their own good faith and understanding of the evidence and the court's instructions on the law, mistakenly may believe that those individuals who steadfastly disagree with them are refusing to deliberate or are intentionally disregarding the law." (*People v. Engelman* (2002) 28 Cal.4th 436, 446 (*Engelman*).)

Setting aside the jurors' opinions regarding Juror No. 12, their testimony regarding Juror No. 12 did *not* reveal that her conduct objectively evinced a refusal to speak with other jurors or consider their viewpoints and the evidence adduced at trial. At most, the jurors expressed a dissatisfaction with the quality and content of Juror No. 12's comments and her ultimate

17

opinion regarding the evidence.  For example, Juror No. 2 expressed dissatisfaction with how Juror No. 12 responded—refusing to answer "yes-or-no question[s] with a yes or no"—and the perceived quality of her answers, which Juror No. 2 viewed as opinions without "any evidence to back up what she says."  Juror No. 1 likewise testified that Juror No. 12 would repeatedly offer her opinion during deliberations, but faulted her with failing "to present any factual tidbit that caused her to take the position she was taking." Likewise, Juror No. 7 acknowledged Juror No. 12 would answer questions, but faulted her with "not acting like a reasonable person" and offering an opinion with "no reasoning to it."

Other jurors admitted Juror No. 12 continued to discuss the case in deliberations but faulted her reasoning premised on a single opinion, believing she needed to express additional opinions on other topics.  Juror No. 10 stated that "Juror No. 12 has stated her opinion multiple times and—but that's where it goes.  But it's an opinion about one thing."  Juror No. 9 expressed her dissatisfaction with Juror No. 12's contribution to the discussion because "[s]he kept saying the same thing."  Juror No. 8 expressed frustration with Juror No. 12's repeated responses and told her that "you've said this over and over again.  We need to hear something different.  We need to hear why you—why you're feeling this way."

These comments, along with other comments, suggest that Juror No. 12 was speaking with the other jurors, considering their viewpoints, and offering her opinion in deliberations.  Simply because the other jurors were not satisfied with her opinion and the quality of her reasoning does not support a finding that she was refusing to deliberate.  "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge. Similarly,

18

the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted does not constitute a refusal to deliberate and is not a ground for discharge." (*Cleveland, supra,* 25 Cal.4th at p. 485.) "It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so. As we have stated, it is not required that jurors deliberate well or skillfully." (*Engelman, supra,* 28 Cal.4th at p. 446.)

The jurors' testimony also does not support the trial court's finding that Juror No. 12 refused to deliberate because she formed a "fixed conclusion" regarding the case before she reasonably could do so. Notably, the court found that Juror No. 12 began deliberations "the same as everybody else did at the very beginning."

Even accepting the truth of the testimony of the other jurors, Juror No. 12's quick decision regarding the strength, or lack thereof, of the prosecution's case does not disclose a basis for her removal standing alone. "It is not uncommon, or grounds for discharge, 'for a juror (or jurors) in a trial to come to a conclusion about the strength of a prosecution's case early in the deliberative process and then refuse to change his or her mind despite the persuasive powers of the remaining jurors.'" (*Armstrong, supra,* 1 Cal.5th at p. 453; quoting *People v. Bowers* (2001) 87 Cal.App.4th 722, 734 [104 Cal.Rptr.2d 726] (*Bowers*).)

The factual scenario here bears a strong resemblance to the scenario giving rise to the decision in *Bowers*, where the appellate court concluded the trial court abused its discretion in discharging a juror. In *Bowers*, the defendant was charged with sexual offenses against a minor. (*Bowers, supra,* 87 Cal.App.4th at pp. 724-725.) Early on the fourth day of deliberations, the

19

jury foreman informed the court that one of the jurors was refusing to deliberate. (*Id.* at p. 725.) The court then questioned the jurors, who revealed that the holdout juror had stated that he did not believe the victim's testimony and despite being willing to listen to the other jurors, was insistent in his conclusion and became inattentive as they continued their deliberations and implored him to change his mind. (*Id.* at pp. 726-727.) The trial court discharged the juror, finding that he "refused to engage in meaningful deliberations" and had refused to "explain to [the other jurors] the basis for his reasoning for the position that he had taken." (*Id.* at p. 727.) The trial court concluded that the holdout juror "did not enter into meaningful deliberations. That either he made up his mind here in the courtroom after having heard the first witness, which is what he apparently told his fellow jurors or once he got in the jury room after he initially and almost immediately indicated his position and refused to meaningfully discuss that position with the other jurors or to meaningfully consider the statements and the evidence as they attempted to discuss with him. And that he refused to participate with them even after their numerous efforts to advise him of his duty and to attempt to elicit cooperation." (*Id.* at p. 728.)

The appellate court reversed, concluding the trial court abused its discretion in discharging the juror. The *Bowers* court explained that the record demonstrated the juror "deliberated and participated to some degree in group discussions." (*Bowers*, *supra*, 87 Cal.App.4th at p. 732.) Moreover, it recognized that a juror who "either made up his mind in the courtroom after hearing the first witness or almost immediately after deliberations started . . . does not amount to misconduct or a failure to deliberate." (*Id.* at p. 733.) "It cannot be said a juror has refused to deliberate so long as a juror is willing and able to listen to the evidence presented in court, to consider the

20

evidence and the judge's instructions, and to finally come to a conclusion and vote, which is precisely what [the juror] did. If the jury hangs because one juror has persistent doubts about the sufficiency of evidence against defendant despite deliberating without bias, a mistrial should result." (*Id.* at p. 735.)

Here, like in *Bowers*, Juror No. 12 appears to have quickly reached the conclusion that John Doe was not credible. The record does not reveal that she refused to listen to the evidence or follow the court's instructions regarding how to consider the evidence and did not hesitate to express her opinion in deliberation with the other jurors. The record does not suggest her credibility determination was the result of any form of bias or made without considering other evidence. The trial court did not find otherwise and in light of the testimony at trial, we cannot say that Juror No. 12's conclusion that Doe was not credible was manifestly irrational. It is certainly within a juror's purview, as instructed by the court, to consider the witnesses' credibility in reaching her conclusion. (See, e.g., *People v. Jones* (1990) 51 Cal.3d 294, 314 ["it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends"].) Juror No. 12's relatively quick consideration of the evidence and reaching a conclusion regarding Barton's guilt based on her own credibility determination does not support a finding that she refused to deliberate. Indeed, after Juror No. 12 was replaced, the newly constituted jury reached its verdict within a few hours. Neither the prosecution nor the court suggested that the entire jury's relatively quick decision was based on any misconduct by those jurors or refusal to deliberate. Just as a jury could reasonably reach a decision within a few hours, Juror No. 12 could

21

reasonably reach her conclusion that Barton was not guilty within a few hours.

Once Juror No. 12 reached her conclusion, her refusal to change her mind and her decision to no longer attempt to explain that decision to the other jurors also does not amount to misconduct. "[T]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view. . . ." (*Engelman*, *supra*, 28 Cal.4th at p. 446.) "A juror who has participated in deliberations for a reasonable period of time may not be discharged for refusing to deliberate, simply because the juror expresses the belief that further discussion will not alter his or her views." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) Juror No. 12 participated in deliberations for multiple days and, although she ultimately did not change her mind, the record discloses that she listened to other jurors and continued to consider the evidence for a reasonable time. Although jurors may often change their mind based on their discussions with the rest of the jury, maintaining a consistent opinion across multiple days of deliberations does not demonstrate a refusal to deliberate.

The trial court also found Juror No. 12 created a "sort of emotional distance" with the other jurors, supporting the conclusion that she was refusing to deliberate. We do not disagree that the other jurors offered testimony supporting this conclusion. They testified Juror No. 12 did not engage in "small talk" or "chitchat" with the other jurors during breaks in the trial. Others suggested she was not friendly. She did *not*, however, physically separate herself during deliberations. Rather, she sat at the head of the table.

While the Supreme Court in *Cleveland* held that a juror who separates herself physically from the remainder of the jury may suggest she is refusing to deliberate, we are not aware of any opinion holding that a juror who is deemed unfriendly or that does not participate in "chitchat" conversations with the other jurors during breaks may be discharged. Although jury deliberations may be most effective when the jurors are amicable and deliberate with a sense of camaraderie, "jurors can be expected to disagree, even vehemently, and to attempt to persuade disagreeing fellow jurors by strenuous and sometimes heated means." (*People v. Johnson* (1992) 3 Cal.4th 1183, 1255.) Here, the other jurors may have concluded that Juror No. 12 was not friendly, but their testimony revealed she did not "functionally separate[] herself from the rest of the jury," as the Attorney General suggests on appeal.[2] During deliberations, one juror faulted her with rolling her eyes and looking away when other jurors discussed the evidence. Although this conduct may have heightened the tensions in the jury room, it is not grounds for her discharge and reveals she continued to listen to the other jurors even if she was not persuaded by their arguments.

Considered altogether, the jurors' testimony demonstrates that Juror No. 12 reached an opinion at odds with the other jurors, who grew frustrated when she was unable to convince them that her opinion was correct and

---

[2]   Some jurors suggested that Juror No. 12 occasionally looked at her cell phone during deliberations. In *Armstrong*, the Supreme Court suggested that a juror who repeatedly looks at a book or cell phone during deliberations may be attempting to separate herself from the other jurors, but "de minimis references to a book and cell phone do not support a determination that [a juror] was refusing to deliberate." (*Armstrong*, *supra*, 1 Cal.5th at p. 452.) Here, the references to Juror No. 12 looking at her cell phone were de minimis and the trial court does not appear to have relied on this testimony to find Juror No. 12 was refusing to deliberate.

reasonable, refused to accept their arguments to the contrary, and declined to engage in their attempts to change her mind by deliberating in a different manner that did not involve consideration of John Doe's credibility. This is an insufficient basis for discharging a juror. As the Supreme Court in *Cleveland* explained, "the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts, or the manner in which deliberations should be conducted . . . is not a ground for discharge." (*Cleveland*, *supra*, 25 Cal.4th at p. 485.) Accordingly, the trial court abused its discretion in discharging Juror No. 12.

The trial court's error in discharging Juror No. 12 warrants reversal.[3] (*Bowers*, *supra*, 87 Cal.App.4th at pp. 735-736.) She was the lone holdout juror who consistently held to her belief Barton was not guilty and, had she remained on the jury, it is reasonably probable the case would have ended in a mistrial, a more favorable result for Barton than conviction. (*Ibid.*) Instead of a mistrial, Barton was convicted within hours after Juror No. 12 was discharged and the alternate juror joined the jury. There is no double jeopardy bar to retrial of the case. (*Armstrong*, *supra*, 1 Cal.5th at p. 454; citing *People v. Hernandez* (2003) 30 Cal.4th 1, 6.)

II

SUFFICIENCY OF THE EVIDENCE

After the filing of our decision, the Supreme Court granted review and transferred the matter to this court with directions to consider Barton's

---

[3]    Because we hold that the judgment must be reversed based on the trial court's error in discharging Juror No. 12, we need not consider Barton's other arguments on appeal in favor of a reversal other than his challenge to the sufficiency of the evidence, discussed *post*.

24

"claim that the evidence was insufficient to sustain his convictions for forcible oral copulation and forcible sodomy. (*Burks v. United States* (1978) 437 U.S 1, 16-18; *People v. Morgan* (2007) 42 Cal.4th 593, 613; *People v. Hayes* (1990) 52 Cal.3d 577, 631 [(*Hayes*)].)" Having now considered the claim, we conclude the evidence was sufficient to support the jury's verdict.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

For purposes of his appeal, Barton does not dispute that the sexual acts occurred. Rather, he focuses only on the sufficiency of the evidence to support that the acts occurred "by means of force, violence, duress, menace or

fear of immediate and unlawful bodily injury." (§§ 288a, subd. (c)(2)[4], 286, subd. (c)(2)(A).) More specifically, both parties appear to agree that because Barton did not use direct force, violence, or threats of physical injury, the jury's verdict is premised on an implied finding that Barton performed the acts by means of duress.

As used in these statutes, "duress" is defined to mean " 'a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' " (*People v. Leal* (2004) 33 Cal.4th 999, 1004; quoting *People v. Pitmon* (1985) 170 Cal.App.3d 38, 48 (*Pitmon*); see also *People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

"The total circumstances, including the age of the victim, and his relationship to defendant are factors to be considered in appraising the existence of duress." (*Pitmon*, *supra*, 170 Cal.App.3d at p. 51; see also *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 ["Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes."].) Although many of the cases discussing the element of duress arise in situations where the abuse is happening between family members, the same general principles are applicable here. "Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 14.) "The very nature of duress is psychological coercion. A threat to a child of

---

4    After Barton's conviction, section 288a was renumbered and is now set forth in section 287.

adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress . . . ." (*Id.* at p. 15.)

Considering the totality of the circumstances, we conclude the evidence is sufficient to support the jury's implied finding of duress. Importantly, Barton's abuse must be placed within the context of his role as a teacher and authority figure at a military school. Doe was a 14-year-old "cadet" at the school, where he had very little freedom within the Academy's highly-structured environment.

Within this strict environment, Doe was dependent on Barton for two primary reasons. First, Barton provided Doe with his only relief from his spartan existence. Barton would buy Doe food because Doe was a vegetarian and the mess hall primarily served meat. Barton also let Doe lounge at his house and would let Doe watch television, drink soda, and eat candy. Barton further made the situation livable for Doe by buying him expensive presents and paid for Doe to take trips off campus.

Second, Barton was able to establish himself as an important "father figure" in Doe's life with the ability to strongly influence Doe's mother. Barton established the same relationship with Doe's grandparents. Doe's mother had placed Doe in the Academy with the understanding that if he behaved for one year, he could return to public school with all of his friends. Thus, any suggestion by Barton to Doe's mother or grandparents that Doe was not behaving would have serious consequences for Doe.

Within this context, Doe explained that he had no choice but to submit to the molestation because "there's just nowhere to run to. There's nowhere to go. . . . I really felt like I had absolutely no choice. I felt like I was captive,

27

which ultimately I was.  I was in a lockdown military school.  There was nowhere to go."  Doe further explained that on campus, "I had zero power.  And [Barton] . . . he had a bit of clout on the campus.  He was more in control than any of the teachers would be.  If anything, he was kind of just below the president, as far as what his power was on the campus."  Given this power differential, Doe felt powerless to stop the abuse and knew that if he complained or resisted, "[t]he best-case scenario is I'm going to a worse military school."

Doe did not reach this conclusion based on mere speculation.  Rather, Barton made it clear that if Doe did not submit to the molestation, there would be consequences.  Barton threatened to tell Doe's mother that Doe was "acting up."  Another student recalled Doe telling him that Barton threatened to stop tutoring him and to tell Doe's mother that he was "acting up" if he refused to go on a trip with Barton.  Thus, based on Barton's representations, Doe reasonably perceived Barton as having "control of my complete life and of all of my family unit."  Accordingly, Doe was psychologically coerced into submitting to Barton's lewd acts because he knew that if he failed to do so, he would suffer significant hardship.  Moreover, Barton made Doe think it was futile to complain by informing Doe that he had previously been accused of molestation but was able to "beat the case."

Considered altogether, the evidence establishes that Doe submitted himself to Barton's abuse because of the duress caused by being placed in a strict military academy where Barton, a middle-aged authority figure, had complete control over Doe's ability to obtain food that suited his diet, find a break from the strict environment, and controlled Doe's ability to eventually leave the military school.  Doe did not form an impression of such coercion based on mere speculation, but rather reached this conclusion after Barton

made it clear that he would exact revenge if Doe objected and that it would be futile to complain. The evidence was more than sufficient to support the jury's implied finding that Barton committed the sexual acts by means of duress. Thus, Barton's challenge to the sufficiency of the evidence to support the jury's verdict is meritless. While we reverse the judgment due to the error regarding discharge of Juror No. 12, Barton may be tried again for these offenses given our conclusion that the evidence was sufficient to sustain the convictions at the previous trial. (See, e.g., *Hayes, supra*, 52 Cal.3d at p. 631.)

DISPOSITION

The judgment is reversed.

HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.