Filed 8/17/23  P. v. Williams CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>KRISTOPHER MICHAEL WILLIAMS,<br><br>     Defendant and Appellant. | A165264<br><br>(Solano County Super. Ct. No. FCR341032) |

A jury found Kristopher Michael Williams guilty of murder (Pen. Code,[1] § 187, subd. (a)), kidnapping (§ 207, subd. (a)), and three other felony charges. In this appeal, he asks us to review the reporter's transcript of his in-camera *Pitchess* hearing and seeks reversal of his conviction on five grounds: (1) insufficient evidence for the asportation element of kidnapping; (2) abuse of discretion in the trial court's exclusion of certain defense evidence; (3) instructional error; (4) prosecutorial misconduct; and (5) cumulative error. Finding no abuse of discretion in the *Pitchess* transcript and no reversible error in any other respect, we affirm the conviction.

---

[1] All subsequent statutory references are to the Penal Code unless otherwise noted.

1

# BACKGROUND

L.N. was nine years old when Williams came to her home, stabbed her father (Gary), and entered her room, where he picked L.N. up and carried her out of the house. Once outside, Williams was confronted by L.N.'s "uncle," Jonathan Russell, whom Williams stabbed before running away.

The District Attorney filed an information charging Williams with the following counts and allegations: (1) murder (§ 187, subd. (a)) with a personal knife use allegation (§ 12022, subd. (b)(1)); (2) kidnapping (§ 207, subd. (a)) with an allegation that victim was under 14 years old (§ 208, subd. (b)); (3) assault with a deadly weapon (§ 245, subd. (a)(1)) with a personal infliction of great bodily injury enhancement (§ 12022.7, subd. (a)); (4) child abuse or endangerment (§ 273a, subd. (a)); and (5) first degree burglary (§ 459) with a non-accomplice present (§ 667.5, subd. (c)).

Before trial, Williams's counsel moved under the Evidence Code sections enacted after the publication of *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, for the disclosure of evidence contained in the personnel files of 19 police officers identified by Williams as being involved in the investigation of his case. After reviewing several documents found in those personnel files at an in-camera hearing, the trial court found no relevant evidence and denied the *Pitchess* motion accordingly.

Williams testified at trial. Before the incident underlying the charges, Williams would occasionally "r[u]n into" L.N.'s mother "in town." When he would ask how "the family [is] doing," L.N.'s mother would tell Williams, "I think she's being molested by her dad and her uncle." He also "heard some stories before in the past" to similar effect. On the night of the crime, Williams was with friends outside L.N.'s home when he saw a disturbing image through a window: Gary and Russell were "standing over" L.N. as

Russell grabbed "his private area." Williams then went to L.N.'s room in order to protect her from molestation.

On cross-examination, the prosecutor focused on apparent inconsistencies and gaps in Williams's direct testimony. Aside from L.N.'s mother, Williams could not name anyone he heard the molestation rumors from. Nor could he remember where or in whose company he was when he heard the rumors. When the prosecutor asked why Williams had not told police that he saw Russell grabbing himself, Williams responded, "I don't know. I don't have an explanation for it."

After the conclusion of the presentation of evidence, the trial court heard argument concerning jury instructions. The prosecutor sought the inclusion of the Judicial Council's California Criminal Jury Instructions (CALCRIM) No. 361, pertaining to the defendant's failure to explain or deny adverse evidence. The prosecutor argued that the instruction was warranted because, when she asked Williams why he falsely told his girlfriend that he had thrown up in the interview room after he was arrested and that he had told the truth to the deputies, he answered that he did not have an explanation. Defense counsel objected on the ground that what the prosecutor was describing was simply impeachment, not a failure to explain adverse evidence. The trial court overruled the objection, saying, "I think it's maybe not the classic presentation of this, but I do think it applies."

The jury found Williams guilty as charged. This appeal followed.

## DISCUSSION

### 1. *There Was No Abuse of Discretion in the Trial Court's Denial of Williams's* Pitchess *Motion.*

Williams asks us to conduct an independent review of the in-camera hearing on his *Pitchess* motion and the Attorney General makes no objection. We routinely grant such requests " 'to determine whether the trial court

3

abused its discretion in denying a defendant's motion for disclosure of police personnel records.' " (*People v. Myles* (2012) 53 Cal.4th 1181, 1209 (*Myles*), quoting *People v. Prince* (2007) 40 Cal.4th 1179, 1285.)

As Williams correctly notes, our Supreme Court in *People v. Mooc* (2001) 26 Cal.4th 1216, 1229, held that a custodian of records appearing at a *Pitchess* hearing "should be prepared to state in chambers and for the record what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." But as the same court later explained in *People v. Fuiava* (2012) 53 Cal.4th 622, 647, "a failure to specify what documents in a file were not brought to court" does not, "by itself, result in an inadequate record." Rather, a "sealed transcript . . . in which the [trial] court 'state[s] for the record what documents it examined,' is adequate for purposes of conducting a meaningful appellate review." (*Myles*, *supra*, 53 Cal.4th at p. 1209, quoting *People v. Mooc*, *supra*, at p. 1229.)

Here, the trial court made the requisite statements and in turn, produced an adequate record: The reporter's transcript identifies each document examined, names the officer or officers each document concerns, and for each document establishes a reasonable basis underlying the trial court's determination that the document was irrelevant. Having reviewed that record, we are satisfied that the trial court acted within its discretion in denying Williams's *Pitchess* motion.

### 2. *There Is Substantial Evidence of Asportation.*

As Williams observes, the kidnapping charge "was the underlying felony for the burglary charge," and in turn, both the burglary and the kidnapping "were the felonies that supported the first-degree felony murder

charge" under the felony-murder theory contemplated by the jury instructions. Williams argues that his conviction should be reversed because there was insufficient evidence to prove the asportation element of simple kidnapping (§ 207, subd. (a)). We disagree.

" 'In reviewing the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found [this] element[ ] of the crime beyond a reasonable doubt." ' [Citation.] 'Substantial evidence' is evidence which is ' "reasonable in nature, credible, and of solid value." ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 613–614.)

Every " 'person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping.' (§ 207, subd. (a).) 'Thus, to prove this crime, the prosecution must generally "prove three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance." ' " (*People v. Bell* (2009) 179 Cal.App.4th 428, 435, quoting *People v. Jones* (2003) 108 Cal.App.4th 455, 462.) "This last element, i.e., that the victim be moved a substantial distance, is called the 'asportation' element." (*Ibid*.)

In determining whether this element has been proven, the trier of fact should consider the " 'totality of the circumstances,' " "including factors like 'whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.' " (*People v.*

*Gomez* (2018) 6 Cal.5th 243, 304, quoting *People v. Martinez* (1999) 20 Cal.4th 225, 237 (*Martinez*), overruled on another ground in *People v. Fontenot* (2019) 8 Cal.5th 57, 70.)  However, those "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." (*Martinez, supra*, at p. 237.)

Here, Williams moved the victim approximately 53 feet, a distance greater than at least some of the distances deemed substantial in our caselaw.  (See, e.g., *People v. Arias* (2011) 193 Cal.App.4th 1428, 1435 [15 feet]; *People v. Singh* (2019) 42 Cal.App.5th 175, 188 [10 feet].)  We therefore conclude that the 53-foot asportation in this case was not so "very short" as to preclude consideration of the contextual factors which might render that distance substantial.  (*Martinez, supra*, 20 Cal.4th at p. 237.)

Those contextual factors are dispositive here.  Moments after Williams brought L.N. outside, a violent altercation ensued between Williams and Russell.  Not only was the child in close proximity to that altercation; she was physically involved—the object of a "tugging match" between the two men. During the struggle, L.N. was "screaming and kicking, saying, 'I [want] my dad.  Let me go.' "  At the time, Williams was carrying a folding knife, which he subsequently used to stab Russell.  And crucially, when Russell intervened, Williams was carrying L.N. toward the white truck in which he had arrived.  In other words, the asportation caused L.N. to be subjected to a violent altercation involving a man armed with a knife.  Thus, a jury could reasonably conclude that the "movement increased the risk of harm above that which existed prior to the asportation."  (*Martinez, supra*, 20 Cal.4th at p. 237.)

In his reply brief, Williams resists this conclusion by arguing that L.N.'s movement "from inside the house to outside did not substantially alter

her environment such that it increased the level of danger to which she was subjected." However, Williams identifies no authority to establish that our analysis must be limited to whether, *in the abstract*, a location outside the home where there are additional people poses a greater or lower risk of danger than a room inside the victim's home. We consider whether there is substantial evidence to support a finding of increased risk of harm under "the totality of the circumstances." (*Martinez, supra*, 20 Cal.4th at p. 237.) Here, those circumstances include Russell's presence outside, the violent confrontation between Russell and Williams while Williams carried L.N. toward the truck, and Williams being armed with a knife. Even if other inferences might be drawn from that evidence, the inference drawn by Williams's jury was well within the province of a "rational trier of fact." (*People v. Morgan*, *supra*, 42 Cal.4th at pp. 613–614.)

### 3. The Trial Court Acted Within Its Discretion in Excluding Lentino's Proffered Testimony.

Williams contends that the trial court abused its discretion in excluding as irrelevant the proffered testimony of defense witness Kristie Lentino. Specifically, Williams argues that excluding Lentino's testimony deprived him of the ability to present a full defense and to impeach the testimony of several prosecution witnesses. We disagree.

When asked for an offer of proof, Williams's trial counsel told the trial court that Lentino would testify about socializing with Gary when L.N. was about five years old. Around that time, Lentino visited Gary's residence and did not see "any food"; she observed that the house was "filthy" and "dirty everywhere," with "clutter everywhere," including "trash [lying] out on the floor, counter," and "tables." Even worse, she saw Gary "taking dollar bills and throwing them at" L.N., "acting like his own daughter was a stripper."

7

According to Williams's trial counsel, that proffered testimony's relevance lay in its descriptions of the "condition of the house" and Gary's "sexualized behavior" toward L.N.  The trial court excluded the testimony as irrelevant.  With respect to the "condition of the house," the trial court noted that the testimony concerned a visit made "four years prior" to the kidnapping, to a different house from the one where the kidnapping took place, and that there was already undisputed evidence about the condition of the house at the time of the kidnapping.  As for the dollar bill incident, the trial court stated that there had been "no testimony from [Williams] that would make this relevant."

"Only relevant evidence is admissible, and the trial court has broad discretion to determine the relevance of evidence."  (*People v. Cash* (2002) 28 Cal. 4th 703, 727.)  "That discretion is only abused where there is a clear showing the . . . court exceeded the bounds of reason, all of the circumstances being considered."  (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 32.)

Here, the defense theory was that Williams "did not commit a kidnapping because he" was acting "to protect [L.N. from] imminent harm."  But at the time of the trial court's ruling, Williams had already completed his testimony, in which he referred to "stories" and "rumors" of molestation, but mentioned neither Lentino, nor the dollar bill incident, nor the condition of Gary's house at a different address four years before the kidnapping.  Williams contends that he was referring to the dollar bill incident when he testified that he had heard "about some stuff . . . at a party that Gary was at with" L.N., and at trial Williams's counsel offered to re-call him to testify to that effect.  But Williams does not offer argument or authority to establish that the trial court abused its discretion by declining to allow the defense to re-call Williams over the prosecution's objection.  We acknowledge the trial

8

court incorrectly stated that Williams previously testified "he did not know what any of these rumors are"; as noted, Williams testified to hearing rumors that L.N. was being molested, and he was not otherwise asked about their substance. The court was, however, correct that Williams could not say from whom (besides L.N.'s mother) he had heard them. In the absence of evidence that Williams ever heard about the matters about which Lentino would have testified, and thus that they could have informed his state of mind at the time of the kidnapping, the trial court did not abuse its discretion by concluding that the proffered testimony was not relevant.

On appeal, Williams offers a somewhat different argument than the one his counsel made in the trial court, contending that Lentino would have impeached testimony by prosecution witnesses that Gary and L.N. had a close and normal parent-child relationship, and that L.N. was well cared for and protected. But nothing in the offer of proof suggests that anyone other than Gary, L.N., and Lentino witnessed or heard about the dollar bill incident, and no prosecution witness had described the condition of Gary's former house when L.N. was five years old. Thus, Lentino's testimony would do little to undermine those other witnesses' credibility.

Under those circumstances, we cannot say that the trial court abused its discretion in concluding that Lentino's proffered testimony was irrelevant.

### 4. Williams Was Not Prejudiced by the CALCRIM No. 361 Jury Instruction.

Williams contends that the "trial court committed error when it instructed the jury with CALCRIM No. 361," concerning a defendant's failure to explain or deny adverse evidence. We do not reach the question of whether the trial court erred because it is not "reasonably probable" that Williams was prejudiced by the instruction. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

9

In applying that standard, we follow *People v. Saddler* (1979) 24 Cal.3d 671, 683–684, and "later case law hold[ing] rather uniformly that if the [CALCRIM No. 361] instruction is erroneously given the jury, the appropriate inquiry becomes that enunciated in *People v. Watson*, *supra*, 46 Cal.2d 818, 836, i.e., whether a different result would have been reasonably probable in the absence of the error." (*People v. Roehler* (1985) 167 Cal.App.3d 353, 393.) We are unpersuaded by Williams's argument for the application of the harmless-beyond-a-reasonable-doubt standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.) Citing *People v. Roder* (1983) 33 Cal.3d 491, 504, Williams urges us to apply the *Chapman* standard because an "instruction in a criminal case may not create a presumption that might relieve the prosecution of its burden of proving every element beyond a reasonable doubt." However, the instruction at issue expressly disclaims such a presumption, warning that the "People must still prove the defendant guilty beyond a reasonable doubt."

As given to the jury in Williams's case, CALCRIM No. 361 instructs: "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence. Any such failure is not enough by itself to prove guilt. The People must still prove the defendant guilty beyond a reasonable doubt. [¶] If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

Williams argues that he "answered the questions put to him by the prosecutor during . . . cross-examination," but the CALCRIM No. 361 instruction "suggested to the jury that appellant might have failed to explain or deny evidence against him. It equally invited the jury to draw negative

10

inferences, even though he did not fail to explain or deny adverse evidence." We are not persuaded.

As we observed in *People v. Vega* (2015) 236 Cal.App.4th 484, 502, CALCRIM No. 361 displays a "carefully constructed internal balance." It "does not direct the jury to draw an adverse inference. It instructs the jury that failure to explain or deny *alone* is not a sufficient basis upon which to infer guilt, and it highlights the prosecution's burden to prove guilt beyond a reasonable doubt." (*Ibid.*) "Ultimately, the instruction leaves the 'meaning and importance' of the failure to explain or deny in the jurors' hands." (*Id.* at pp. 502–503.) And like the trial court in *Vega*, the trial court here also "told the jury . . . that not all the instructions were necessarily applicable (CALCRIM No. 200), and advised jurors to follow the instructions that applied to the facts determined by them, thereby 'mitigat[ing] any prejudicial effect' related to the giving of CALCRIM No. 361, if it were deemed to be improper." (*Ibid.*, quoting *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472–1473.)

Moreover, there was ample reason for the jury to question Williams's credibility even in the absence of the instruction. When police interviewed him after the kidnapping, Williams said nothing about witnessing a molestation or any rumors to that effect. In the same interview, Williams said that he was "not 100% sure but there might've been a window outside of the house that . . . looked into [L.N.'s] room," and he did not mention Russell grabbing himself. Thus, Williams only began speaking about the alleged imminent harm (and expressing confidence about the existence of the window through which he witnessed it) after he was criminally charged. Moreover, on cross-examination Williams was unable to name the other people (besides

11

L.N.'s mother) from whom he heard rumors of molestation. Nor could he tell the jury where or in whose company he was when he heard the stories.

" 'Jurors are presumed to be intelligent, capable of understanding instructions and applying them to the facts of the case.' " (*People v. Lewis* (2001) 26 Cal.4th 334, 390.) Here, considering CALCRIM No. 361 in its entirety, along with the rest of the jury instructions and the independent reasons for the jury to have doubted Williams's credibility, we see no reasonable likelihood that Williams would have obtained a more favorable result in the absence of the claimed error. Thus, any instructional error in this respect was " ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal. 4th 58, 67, quoting *People v. Rowland* (1992) 4 Cal.4th 238, 282.)

### 5. *There Is No Reversible Error in the Alleged Instances of Prosecutorial Misconduct.*

Williams argues that his conviction should be overturned for four alleged instances of prosecutorial misconduct: (1) posing an improper question to Sergeant Hendrix of the Solano County Sheriff's Office; (2) moving to admit a photograph containing a reference to the Vacaville Hell's Angels gang, in violation of a trial court order; (3) repeatedly calling Williams a liar during closing argument; and (4) during closing argument, accusing Williams of lying specifically about the molestation of L.N., despite the prosecutor's knowledge of Lentino's proffered testimony. We disagree.

"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) But a "defendant will be excused from the necessity of either a timely objection

and/or a request for admonition if either would be futile." (*People v. Hill* (1998) 17 Cal. 4th 800, 820.)

Here, Williams's trial counsel failed to object to the admission of the photograph and objected to none of the alleged acts of prosecutorial misconduct during closing argument. Nor can we conclude that making a timely objection would have been futile in either instance: The photograph might have been redacted and the prosecutor might have been stopped the first or second time she accused Williams of lying, instead of going on to make such accusations "22 times," by Williams's count.[2] Therefore, those issues are forfeited.

The only instance of claimed prosecutorial misconduct to which Williams's counsel timely objected was the improper questioning of Sergeant Hendrix. Defense counsel had sent Hendrix a video posted to a social media account, in which L.N. had suggested that her dad was frequently drunk and yelled at her. Hendrix testified that based on his review of the video, "there was a suspicion that the child was expressing emotional abuse," so he "had a patrol deputy respond to" L.N.'s "residence to conduct a welfare check." On cross-examination, the prosecutor focused on the welfare check, asking Hendrix whether he told the patrol deputy, "go there, don't ask any

---

[2] Williams's trial counsel did not object during the closing argument, electing instead to "mak[e]" his "record" after the prosecutor had concluded her remarks and the court had taken a short recess. In making that record, trial counsel acknowledged that he had failed to object, arguing that the offending conduct "was so continuous that it became irrelevant." As we have already noted, however, it was precisely the continuous nature of that conduct that required a timely objection; this would have allowed the trial court to bring an end to the alleged misconduct before it was repeated 21 times. Under these circumstances, deeming the belated "record-making" a timely objection would improperly permit trial counsel to preserve for appeal an error that could have been cured at trial.

13

questions, grab her, and go out of the house with her and stab two people." The Attorney General concedes that this amounted to prosecutorial error.

However, when Williams's counsel objected, the trial court sustained the objection, ordered the question stricken from the record, and admonished the jury as follows: "The Court is also reminding you that questions by the lawyers are not evidence. Only the answers are evidence. So don't consider the questions or anything that they might suggest as evidence." "In the absence of evidence to the contrary, we presume the jury heeded the admonition." (*People v. Burgener* (2003) 29 Cal. 4th 833, 874.) Here, where Williams has adduced no evidence showing that the jury failed to heed the admonition, no prejudice appears under either the *Watson* or *Chapman* standards.

### 6. *There Was No Cumulative Error.*

Finally, Williams argues that his conviction should be reversed for "the cumulative" prejudicial "effect of the errors." We disagree. Only one or two errors were preserved for appeal: one potentially erroneous jury instruction and one instance of prosecutorial error. We concluded that the first was a technical error at most, and the second was cured by the trial court's response. In light of the latter conclusion, the cumulative effect of the errors is not meaningfully different from the effect of either one of them considered alone, and accordingly we find no basis for reversal.

14

## DISPOSITION

We affirm.

GOLDMAN, J.

WE CONCUR:

STREETER, Acting P. J.
HIRAMOTO, J. *

---

\* Judge of the Superior Court of California, County of Contra Costa, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.